**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RYAN ROTH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No: 1:20-cv-01622-DLF** |
| ) | |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants**. ) | |

**ATTORNEY GENERAL WILLIAM P. BARR'S
MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Attorney General William P. Barr, as sued in his individual capacity, respectfully moves this Court to dismiss the claims against him in Plaintiff's complaint. Plaintiff fails to state a claim upon which relief may be granted for two primary reasons. First, neither Congress nor the Supreme Court has authorized a damages remedy under the Constitution against the Attorney General for acting to protect the safety of the President or the security of the White House, and special factors counsel against implying the constitutional damages remedy that Plaintiff seeks. Second, the Attorney General is entitled to qualified immunity from all constitutional claims.

The grounds for this motion are set forth in the accompanying memorandum. A proposed order is attached.

Dated:  November 10, 2020                    Respectfully submitted,

                                            JEFFREY BOSSERT CLARK
                                            Acting Assistant Attorney General
                                            Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* Kelly Heidrich
KELLY HEIDRICH
PA Bar No. 207407, under LCvR 83.2
Senior Trial Attorney,
Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4371; F: (202) 616-4314
Kelly.Heidrich@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Attorney General William P.
Barr in his individual capacity*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RYAN ROTH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No: 1:20-cv-01622-DLF** |
| ) | |
| **DONALD J. TRUMP, et al.,** ) | |
| ) | |
| **Defendants**. ) | |

## MEMORANDUM IN SUPPORT OF ATTORNEY GENERAL WILLIAM P. BARR'S MOTION TO DISMISS ALL INDIVIDUAL-CAPACITY CLAIMS

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* Kelly Heidrich
KELLY HEIDRICH
PA Bar No. 207407, under LCvR 83.2
Senior Trial Attorney
Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4371; F: (202) 616-4314
Kelly.Heidrich@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6313130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov
*Counsel for Attorney General William P.
Barr in his individual capacity*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 1

I.      Civil unrest accompanied racial-justice protests................................................. 1

II.     Law-enforcement officers dispersed Lafayette Square protesters. ..................... 2

III.    Claims against the Attorney General and other defendants. ................................ 4

DISCUSSION ....................................................................................................................... 4

I.      A *Bivens* claim is not available to challenge decisions made by the United States' chief law-enforcement officer to protect the President's safety or the security of the White House in response to civil unrest. ..................................................................... 4

        A.      *Bivens* is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context. ........................................................................... 6

        B.      *Bivens* should not be extended into this novel context.............................. 7

        C.      Special factors preclude a *Bivens* remedy in the presidential-security context. ........ 11

                i.      Courts should not intrude into sensitive matters of presidential security............. 12

                ii.     Congress legislated extensively to enhance presidential and White House security without creating a personal damages remedy in this context. .............................. 15

                iii.    This suit would invite intrusive discovery into the Attorney General's decision making and his confidential communications with the President........................ 21

                iv.     Plaintiff pursues alternative relief that precludes a new *Bivens* remedy. ............. 24

II.     The Attorney General is entitled to qualified immunity because Plaintiff fails to allege that he was personally involved in violating Plaintiff's clearly established constitutional or statutory rights. ....................................................................................................... 27

        A.      The allegations do not plausibly show the Attorney General's personal involvement in violations of clearly established constitutional rights. .......................................... 28

        B.      There is no clearly established First Amendment violation. .................................... 29

        C.      There is no clearly established Fourth Amendment violation................................... 34

CONCLUSION...................................................................................................................... 36

# TABLE OF AUTHORITIES

**Cases**

*A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*,
    845 F.3d 1199 (D.C. Cir. 2017) ....................................................................... 30, 32
*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ........................................................................................ 27, 28
\* *Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ......................................................................................... passim
\* *Berg v. Kelly*,
    897 F.3d 99 (2d Cir. 2018) ............................................................................. 13, 35
*Bernini v. City of St. Paul*,
    665 F.3d 997 (8th Cir. 2012)........................................................................... 35, 36
*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971) ........................................................................................... 4, 6
*Bundy v. Sessions*,
    387 F. Supp. 3d 121 (D.D.C. 2019) ..................................................................... 28
*Bush v. Lucas*,
    462 U.S. 367 (1983) ............................................................................................... 8
*Carlson v. Green*,
    446 U.S. 14 (1980) .......................................................................................... 6, 25
*Carr v. District of Columbia*,
    587 F.3d 401 (D.C. Cir. 2009) ............................................................................. 35
*Cheney v. U.S. Dist. Court for D.C.*,
    542 U.S. 367 (2004) ............................................................................................. 22
*Citizens for Peace in Space v. City of Colo. Springs*,
    477 F.3d 1212 (10th Cir. 2007)............................................................................ 30
*Clark v. Cmty. for Creative Non-Violence*,
    468 U.S. 288 (1984) ....................................................................................... 30, 32
*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................................. 22
*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ............................................................................................... 25
*Crawford-El v. Britton*,
    523 U.S. 574 (1998) ............................................................................................. 23
*Davis v. Billington*,
    681 F.3d 377 (D.C. Cir. 2012) ............................................................................. 25
*Davis v. Passman*,
    442 U.S. 228 (1979) ............................................................................................... 6

*Democracy Forward Found. v. White House Off. of Am. Innovation*,
356 F. Supp. 3d 61 (D.D.C. 2019) ............................................................. 2

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988) ................................................................................. 12

*Doe v. Rumsfeld*,
683 F.3d 390 (D.C. Cir. 2012) ............................................................. 5, 12

*Dundon v. Kirchmeier*,
No. 1:16-cv-406, 2017 WL 5894552 (D.N.D. Feb. 7, 2017) .................... 36

*Farah v. Esquire Magazine*,
736 F.3d 528 (D.C. Cir. 2013) ................................................................. 2

*Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*,
443 U.S. 340 (1979) ................................................................................. 22

*Felarca v. Birgeneau*,
891 F.3d 809 (9th Cir. 2018) .................................................................... 36

*Graham v. Connor*,
490 U.S. 386 (1989) ................................................................................. 35

*Haig v. Agee*,
453 U.S. 280 (1981) ................................................................................. 12

*Halperin v. Kissinger*,
807 F.2d 180 (D.C. Cir. 1986) ................................................................ 21

*Harlow v. Fitzgerald*,
457 U.S. 800 (1982) ................................................................................. 21

*Haus v. City of New York*,
No. 03 CIV 4915, 2011 U.S. Dist. LEXIS 155735 (S.D.N.Y. Aug. 31, 2011) ...................... 28

*Hedgpeth v. Rahim*,
893 F.3d 802 (D.C. Cir. 2018) ................................................................. 27

*Hernandez v. Mesa*,
137 S. Ct. 2003 (2017) ............................................................................... 6

\*  *Hernandez v. Mesa*,
140 S. Ct. 735 (2020) ........................................................................ passim

*Hernandez v. Mesa*,
885 F.3d 811 (5th Cir. 2018) .................................................................... 11

*Hill v. Colorado*,
530 U.S. 703 (2000) ............................................................................ 30, 32

*Hunter v. Bryant*,
502 U.S. 224 (1991) ............................................................................ 21, 27

*In re Sealed Case*,
148 F.3d 1073 (D.C. Cir. 1998) ............................................................... 33

*Int'l Action Ctr. v. United States*,
365 F.3d 20 (D.C. Cir. 2004) ................................................................... 28

*K.O. v. U.S. Immigr. & Customs Enf't*,
   --- F. Supp. 3d ---, No. CV 20-309 (RC), 2020 WL 3429697 (D.D.C. June 23, 2020) ............ 23

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) .................................................................................................. 2

*Klay v. Panetta*,
   758 F.3d 369 (D.C. Cir. 2014) ................................................................................................ 20

*Lash v. Lemke*,
   786 F.3d 1 (D.C. Cir. 2015) .............................................................................................. 31, 34

*Lee v. Barr*,
   No. 19-CV-2284 (DLF), 2020 WL 3429465 (D.D.C. June 23, 2020) ....................................... 8

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Labor*,
   881 F.3d 912 (D.C. Cir. 2018) .......................................................................................... 24, 25

*Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*,
   344 F. Supp. 3d 215 (D.D.C. 2018) ................................................................................. 23, 25

*LKQ Corp. v. United States*,
   No. 18-CV-1562 (DLF), 2019 WL 3304708 (D.D.C. July 23, 2019)............................. 9, 25, 26

\*  *Loumiet v. United States*,
   948 F.3d 376 (D.C. Cir. 2020) ...................................................................................... passim

*Lucas v. United States*,
   443 F. Supp. 539 (D.D.C. 1977) ........................................................................................... 36

*Lyall v. City of Los Angeles*,
   807 F.3d 1178 (9th Cir. 2015)............................................................................................... 35

*Marcavage v. City of New York*,
   689 F.3d 98 (2d Cir. 2012)..................................................................................................... 33

*McNair v. Coffey*,
   279 F.3d 463 (7th Cir. 2002)................................................................................................. 29

*Mejia-Mejia v. U.S. Immigr. & Customs Enf't*,
   No. CV 18-1445 (PLF), 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ............................... 23, 24

*Menotti v. City of Seattle*,
   409 F.3d 1113 (9th Cir. 2005)............................................................................................... 34

*Meshal v. Higgenbotham*,
   804 F.3d 417 (D.C. Cir. 2015) ...................................................................................... passim

*Miller v. U.S. Dep't of Agric. Farm Servs. Agency*,
   143 F.3d 1413 (11th Cir. 1998)............................................................................................. 25

*Minneci v. Pollard*,
   565 U.S. 118 (2012)............................................................................................................... 25

*Nebraska Beef, Ltd. v. Greening*,
   398 F.3d 1080 (8th Cir. 2005)............................................................................................... 25

*Oliva v. Nivar*,
   973 F.3d 438 (5th Cir. 2020).................................................................................................. 26

*Oliveras v. Basile*,
   440 F. Supp. 3d 365 (S.D.N.Y. 2020) .......................................................................... 26

*Payton v. New York*,
   445 U.S. 573 (1980) ...................................................................................................... 10

*Pearson v. Callahan*,
   555 U.S. 223 (2009) ...................................................................................................... 27

*Quaker Action Grp. v. Hickel*, ("*QAG I*")
   421 F.2d 1111 (D.C. Cir. 1969) ...................................................................... 10, 12, 15

*Quaker Action Grp. v. Morton*, ("*QAG III*")
   460 F.2d 854 (D.C. Cir. 1971) .................................................................................... 22

*Quaker Action Grp. v. Morton*, ("*QAG IV*")
   516 F.2d 717 (D.C. Cir. 1975) ...................................................................... 13, 14, 31

*Reichle v. Howards*,
   566 U.S. 658 (2012) ............................................................................................ 8, 13, 27

*Roy v. United States*,
   416 F.2d 874 (9th Cir. 1969) ....................................................................................... 13

*Saucier v. Katz*,
   533 U.S. 194 (2001) ...................................................................................................... 35

*Schweiker v. Chilicky*,
   487 U.S. 412 (1988) ................................................................................................ 15, 20

*Sevy v. Barach*,
   815 F. App'x 58 (6th Cir. 2020) ................................................................................ 34

*Stigile v. Clinton*,
   110 F.3d 801 (D.C. Cir. 1997) ............................................................................ passim

*Surita v. Hyde*,
   665 F.3d 860 (7th Cir. 2011) ....................................................................................... 28

*Tennessee v. Garner*,
   471 U.S. 1 (1985) .......................................................................................................... 35

*Time Warner Ent. Co., L.P. v. FCC*,
   93 F.3d 957 (D.C. Cir. 1996) ...................................................................................... 30

*Tracy v. Neuberger*,
   840 F. Supp. 2d 1183 (D. Minn. 2012) ..................................................................... 28

*United States v. Bursey*,
   416 F.3d 301 (4th Cir. 2005) ....................................................................................... 17

*United States v. Caputo*,
   F. Supp. 3d 65 (D.D.C. 2016) ...................................................................... 14, 17, 31

*United States v. Musser*,
   873 F.2d 1513 (D.C. Cir. 1989) .......................................................................... 14, 31

*United States v. Stanley*,
   483 U.S. 669 (1987) ................................................................................................... 6, 24

*W. Radio Servs. Co. v. U.S. Forest Serv.*,
   578 F.3d 1116 (9th Cir. 2009) ............................................................ 25

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ........................................................................... 30

*Watts v. United States*,
   394 U.S. 705 (1969) ..................................................................... passim

*Westfahl v. District of Columbia*,
   75 F. Supp. 3d 365 (D.D.C. 2014) .................................................... 36

*White House Vigil for ERA Comm. v. Clark*,
   746 F.2d 1518 (D.C. Cir. 1984) ................................................. passim

*White v. Jackson*,
   865 F.3d 1064 (8th Cir. 2017) .......................................................... 36

*Wilkie v. Robbins*,
   551 U.S. 537 (2007) ............................................... 12, 24, 25, 26

*Wilson v. Layne*,
   526 U.S. 603 (1999) ........................................................................... 31

*Wilson v. Libby*,
   535 F.3d 697 (D.C. Cir. 2008) ................................................... 23, 25

\* *Wood v. Moss*,
   572 U.S. 744 (2014) ..................................................................... passim

*Young v. Akal*,
   985 F. Supp. 2d 785 (W.D. La. 2013) .............................................. 36

\* *Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) ................................................................. passim

**Statutes, Session Laws, & Regulations**

5 U.S.C. App. 3 § 12 ............................................................................ 19
5 U.S.C. App. 3 § 8E ............................................................................ 19
6 U.S.C. § 381 ...................................................................................... 18
6 U.S.C. § 111(b)(1)(G) ...................................................................... 19
6 U.S.C. § 113(d)(3) ............................................................................ 19
6 U.S.C. § 345 ...................................................................................... 19
18 U.S.C. § 111(a)(1) .......................................................................... 36
18 U.S.C. § 1751 .................................................................................. 17
18 U.S.C. § 1752 .................................................................................. 17
18 U.S.C. § 3056 .................................................................................. 16
18 U.S.C. § 3056A(a) .......................................................................... 16
18 U.S.C. § 3056(d) ............................................................................. 36
28 U.S.C. § 503 ...................................................................................... 5
28 U.S.C. § 509 ...................................................................................... 5

28 U.S.C. § 1346(b) .................................................................................................. 25
28 U.S.C. § 2671-80 ................................................................................................. 25
42 U.S.C. § 1983 ....................................................................................................... 26
34 Stat. 708 (1906) ................................................................................................... 15
38 Stat. 23 (1913) ..................................................................................................... 16
39 Stat. 919 (1917) (codified at 18 U.S.C. § 871) .................................................. 16
Pub. L. No. 88-202, 77 Stat. 362 (1963).................................................................. 25
Pub. L. No. 107-56, § 1001(3), 115 Stat. 272 (2001) .................................................. 19
Pub. L. No. 107-296, 116 Stat. 2135 (codified as amended at 6 U.S.C. § 381) ........ 18
31 C.F.R. § 413.1 (1995) ............................................................................................ 17
28 Fed. Reg. 12,789 (Dec. 3, 1963)........................................................................... 25
79 Fed. Reg. 63,141 (Oct. 22, 2014)......................................................................... 28

## Other Authorities

Mayor's Order 2020-68 ..................................................................................... 2, 3, 33
Mayor's Order 2020-069 ...................................................................................... 2, 33

*Oversight of the Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 116th
    Cong. (2020)......................................................................................................... 20
*The U.S. Secret Service and Presidential Protection: An Examination of a System Failure:*
    *Hearing Before the H. Comm. on Homeland Sec.*, 111th Cong. (2009) ................................ 18
*White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H.*
    *Comm. on Oversight and Gov't Reform*, 113th Cong. (2014) ................................... 18

*Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*,
    H.R. REP. NO. 95-1828 (1979) ............................................................................. 17
H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916) .................................................. 4, 16

53 CONG. REC. 9378 (1916) ................................................................................... 16

SHAWN REESE, CONG. RSCH. SERV., RL34603, THE U.S. SECRET SERVICE: HISTORY AND
    MISSIONS (2014) .................................................................................................. 16

REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY
    (1964) ("The Warren Commission Report").................................................... 16, 17
United States Secret Service Panel, *Report from the United States Secret Service Protective*
    *Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014) ............... 19

*USSS History: 150 Years of Our History*, U.S. SECRET SERVICE ................................. 16

**INTRODUCTION**

Plaintiff asks this Court to create a new constitutional cause of action for personal damages against the Attorney General for acts taken to ensure the President's safety in response to civil unrest. The Attorney General acted in the midst of several days of protests over the death of George Floyd, an unarmed Black man, who tragically died while in the custody of the Minneapolis police. While demonstrators gathered to express their grief and to protest alleged police brutality, criminal actors and extremist groups attempted to hijack the protests with a number of lawless and dangerous acts. These acts, which included rioting, arson, and looting, led the Mayor of Washington, D.C., to declare a state of emergency and to impose a District-wide curfew. The day after the Mayor's order, as the curfew approached and thousands of protestors gathered outside the White House, Plaintiff alleges that the Attorney General issued an order to clear the protestors from Lafayette Park so that the President could be photographed offering remarks at St. John's Episcopal Church—which had been set on fire the night before.

Plaintiff's claims fail for two fundamental reasons: First, neither Congress nor the Supreme Court has authorized a damages remedy under the Constitution against the Attorney General for acting to protect the safety of the President or the security of the White House. Second, the Attorney General is entitled to qualified immunity because he did not violate any clearly established constitutional right in allegedly dispersing thousands of protesters within weapons range of the President and the White House at a time of civil unrest.

**BACKGROUND**

**I.   Civil unrest accompanied racial-justice protests.**

On June 1, 2020, the Mayor of Washington, D.C., issued an order declaring a "Public Emergency" and imposing a 7:00 pm curfew for the District of Columbia following two violent days in which "numerous businesses, vehicles, and government buildings ha[d] been vandalized,

burned, or looted." Mayor's Order 2020-069 § I ¶ 3, referenced in Complaint for Injunctive

Relief and Damages ("Compl."), ¶ 26.[1] The unrest unfolding across Washington, D.C., occurred

against the backdrop of massive protests in Lafayette Square over the tragic deaths of George

Floyd, Breonna Taylor, and others. Compl. ¶¶ 16-17. From May 29 through May 31, large

crowds assembled in front of the White House in Lafayette Square to protest these deaths and

alleged police brutality against Black people. *Id.* ¶ 20. On May 31, the Mayor ordered a curfew

to start at 11:00 p.m., explaining that, on the past two nights, there had been vandalism, burning,

and looting in downtown D.C., including damage to government buildings. Mayor's Order

2020-68 § I ¶ 4.[2] She issued the order based on this "glorification of violence," which was "not

representative of peaceful protests or individuals exercising their lawful First Amendment

rights." *Id.* When that curfew proved ineffective to stem the unrest, on June 1, the Mayor

imposed an earlier 7:00 p.m. curfew. Mayor's Order 2020-069. While acknowledging the right

of individuals to protest, the Mayor imposed the June 1 curfew to "protect the safety of persons

and property in the District" and to stem the violence that was occurring "at multiple locations

throughout the city, in addition to the rioting in the downtown area." *Id.* § I ¶¶ 4-6.

## II.    Law-enforcement officers dispersed Lafayette Square protesters.

Large protests in Lafayette Square continued on June 1 and were ongoing as the city-

wide curfew was approaching that evening. Compl. ¶ 25. These protests were a continuation of

---

[1] *Available at* https://mayor.dc.gov/sites/default/files/dc/sites/mayormb/release_content /attachments/Mayor%27s%20Order%202020-069.pdf. In deciding a motion to dismiss, the Court may consider the Mayor's Order because it is incorporated by reference in the Complaint, and because it is a public governmental record subject to judicial notice. *See Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018); *Democracy Forward Found. v. White House Off. of Am. Innovation*, 356 F. Supp. 3d 61, 69 & n.5-7 (D.D.C. 2019).

[2] *Available at*: https://www.dcregs.dc.gov/Common/MayorOrders.aspx?Type=Mayor Order&OrderNumber=2020-068. Because this order is a public governmental record, the court may take judicial notice and consider the order in deciding the motion to dismiss. *Supra* note 1.

the prior protests that had created the opportunity for the previous nights' unrest. *See* Mayor's Order 2020-68 § I ¶ 4. Plaintiff participated in these protests. Compl. ¶ 27.

Plaintiff alleges that law-enforcement officers surrounded him and other activists and began dispersing them from Lafayette Square. *Id.* ¶¶ 4, 29-33. According to the complaint, this included U.S. Park Police, Arlington County Police Department, U.S. Secret Service, D.C. National Guard, and Federal Bureau of Prisons personnel. *Id.* ¶ 29. Officers purportedly used a variety of munitions. *Id.* ¶ 33. Shortly after the protesters were dispersed, the President walked from the White House to St. John's Church, which sits on Lafayette Square. *Id.* ¶ 40. The President gave "brief remarks" and "pose[d] for photographs[.]" *Id.* ¶ 41.

Plaintiff alleges that the government's "sole reason" for clearing the protesters—to facilitate the President's "photo opportunity"— constituted a violation of Plaintiff's First Amendment rights. *Id.* ¶¶ 3-5, 51, 60. In addition, Plaintiff alleges that defendants violated his Fourth Amendment rights when protestors were cleared from Lafayette Square. Plaintiff alleges that the White House Deputy Chief of Staff contacted the Secret Service to inform them of President Trump's intention to make an appearance at St. John's Church after making remarks at the White House. *Id.* ¶ 30. According to the complaint, the Secret Service subsequently requested the assistance of other law enforcement agencies to clear the area in and around Lafayette Square and St. John's Church. *Id.*

Plaintiff sues the Attorney General in his individual capacity based on the allegation that he personally gave the order to disperse Lafayette Square to facilitate the President's "photo opportunity" at St. John's Church. *Id.* ¶¶ 3-4, 8, 43-44. Though he speculates regarding the motives of the President, *id.* ¶ 22(f), (g), none of the Attorney General's cited statements suggest any intent to target peaceful protestors. *Id.* ¶ 23. To the contrary, Plaintiff provides several quotes from the Attorney General in which he explicitly states that some protestors had thrown

projectiles and ignored law enforcement directives to move back one block. *Id.* ¶ 51. And while Plaintiff challenges the dispersal order itself on First Amendment grounds, *id.* ¶¶ 56-57, he does not allege that the Attorney General was responsible for the tactical decisions regarding how the area was cleared, which forms the basis of his Fourth Amendment claim, or that he authorized dispersing the crowd in an unconstitutional manner. *See id.* And despite the unrest that led to the curfew, Plaintiff does not claim that any security procedures were in place to screen the massive crowd that had gathered near the White House; nor does he suggest that the Attorney General or any of the officers on the scene could differentiate among lawful protesters and those who might have infiltrated the crowd to do violence. *See generally* Compl.

**III.    Claims against the Attorney General and other defendants.**

Approximately two weeks after the incident, Plaintiff filed suit against the Attorney General in his personal capacity under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). Plaintiff alleges that the Attorney General violated his First and Fourth Amendment rights by dispersing protestors in order to facilitate a presidential photo. *See* Claims 1-2. Additionally, Plaintiff seeks injunctive relief from various high-level federal officials in their official capacities. *Id.*

## DISCUSSION

**I.    A *Bivens* claim is not available to challenge decisions made by the United States' chief law-enforcement officer to protect the President's safety or the security of the White House in response to civil unrest.**

The Nation's "interest in protecting the safety of its Chief Executive and in allowing him to perform his duties without interference from threats of physical violence" is "overwhelming." *Watts v. United States*, 394 U.S. 705, 707 (1969) (per curiam) (citing H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916)). Indeed, it is a vital national-security concern:

> No one can deny the substantiality or the significance of America's interest in presidential security. At stake is not merely the safety of one man, but also the

4

> ability of the executive branch to function in an orderly fashion and the capacity of
> the United States to respond to threats and crises affecting the entire free world.

*White House Vigil for ERA Comm. v. Clark*, 746 F.2d 1518, 1528 (D.C. Cir. 1984) (collecting

cases). Plaintiff's complaint places that vital interest directly at stake: By seeking to hold the

Attorney General personally liable for his alleged role in clearing Lafayette Square before the

President's visit there, plaintiff challenges the Executive Branch's ability to ensure presidential

safety at a time of civil unrest.

The Attorney General's alleged discretionary decision to disperse thousands of

demonstrators who had not been screened and were "within weapons range" of the President

does not subject him to personal liability. *Wood v. Moss*, 572 U.S. 744, 763 (2014) (granting

qualified immunity but reserving question of whether *Bivens* is available in presidential-

security context). "Judicial inquiry into the national-security realm," without approval from

Congress, "raises concerns for the separation of powers in trenching on matters committed to

the other branches." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1861 (2017) (internal quotation marks

and citation omitted) (refusing to recognize *Bivens* remedy against the Attorney General and

FBI Director).

Indeed, in nearly 50 years of *Bivens* litigation, "[t]he Supreme Court has never implied a

*Bivens* remedy in a case involving the military, national security, or intelligence." *Doe v.

Rumsfeld*, 683 F.3d 390, 394 (D.C. Cir. 2012). "[I]n accord with the [Supreme] Court's" frequent

warning that it has "refused to extend *Bivens* to any new context or new category of defendants,"

*Abbasi*, 137 S. Ct. at 1857 (internal quotation marks and citations omitted), this Court should

refuse to impose new liability on the Attorney General—the Nation's highest ranking law-

enforcement official, *see* 28 U.S.C. §§ 503, 509—for decisions he allegedly made to ensure the

security of the President and the White House at a time of unrest.

### A. *Bivens* is a disfavored extra-statutory remedy that the Supreme Court has not authorized in this context.

The "antecedent" question in this case is whether the Court should devise a freestanding damages remedy under the Constitution. *Hernandez v. Mesa*, 137 S. Ct. 2003, 2006 (2017). Indeed, whether to authorize a "damages action under the Constitution for particular *injuries*" in a particular context is a "question logically distinct from immunity to such an action on the part of particular *defendants*." *United States v. Stanley*, 483 U.S. 669, 684 (1987). The Supreme Court's answer to the antecedent question—in a variety of contexts over the past "40 years" has been frequent and unequivocal: No. *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (collecting cases); *accord Loumiet v. United States*, 948 F.3d 376, 380-81 (D.C. Cir. 2020).

In 1971, the Supreme Court took the unprecedented step of creating a private cause of action under the Fourth Amendment—without Congressional authorization—after holding there were "no special factors counselling hesitation." *Bivens*, 403 U.S. at 396, 397 (authorizing private damages remedy against line-level federal agents who entered and searched plaintiff's home without a warrant, handcuffed him, and arrested him for drug violations). The Supreme Court has extended *Bivens* only twice since then and only after noting the absence of special factors. *See Davis v. Passman*, 442 U.S. 228, 245 (1979) (recognizing equal protection claim against a congressman for firing his female secretary); *Carlson v. Green*, 446 U.S. 14, 18-19 (1980) (recognizing claim against prison officials for failing to treat inmate's asthma). "These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 137 S. Ct. at 1855. Since *Carlson*, the Supreme Court has "consistently rebuffed requests to add to the [three] claims allowed under *Bivens*." *Hernandez*, 140 S. Ct. at 743 (collecting cases).

Authorizing a new *Bivens* action is thus a "'disfavored' judicial activity." *Hernandez*, 140 S. Ct. at 742 (quoting *Abbasi* 137 S. Ct. at 1857) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662

(2009)). Twice in the past three years alone, the Supreme Court has declared that the arguments underpinning *Bivens* have "los[t] their force" and that "the Court's three *Bivens* cases [implying a remedy] might have been different if they were decided today." *Abbasi,* 137 S. Ct. at 1855-56; *accord Hernandez*, 140 S. Ct. at 742-43. While *Bivens* has not been overruled, it is the product of an "'*ancien regime*'" in which the Court effectively "arrogat[ed] legislative power." *Hernandez*, 140 S. Ct. at 741 (quoting *Abbasi*, 137 S. Ct. at 1855); *see also Abbasi*, 137 S. Ct. at 1869 (Thomas, J., concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action.") (internal quotations and citations omitted).

The Supreme Court's retreat from *Bivens* is no accident but a principled return to basics: respect for "separation-of powers" means the creation of damages claims should be "committed to those who write the laws rather than those who interpret them." *Abbasi*, 137 S. Ct. at 1857 (quotation marks and citations omitted). "Congress," not the Judiciary, "is best positioned to evaluate 'whether, and the extent to which, monetary and other liabilities should be imposed upon individual officers and employees of the Federal Government' based on constitutional torts." *Hernandez,* 140 S. Ct. at 742 (quoting *Abbasi*, 137 S. Ct. at 1856). As recently echoed by the D.C. Circuit, "judges are not well-suited" to decide "how to balance these competing considerations in various contexts." *Loumiet*, 948 F.3d at 381.

### B.  *Bivens* should not be extended into this novel context.

Because judges aren't well-suited to undertake these legislative tasks, "the first question a court must ask" before potentially imposing liability on a federal officer is "whether the claim arises in a new *Bivens* context." *Abbasi*, 137 S. Ct. at 1864; *accord id.* at 1860. A case presents a new context when it differs "in a meaningful way" from the three "previous *Bivens* cases" in which the Supreme Court created a damages remedy (*Bivens*, *Davis*, and *Carlson*). *Id.* at 1859. Notably, the Court limited the context inquiry to "[t]hese three" Supreme Court "cases." *Id.* at

1855. That strict limitation overrides any earlier lower court decisions extending *Bivens*. *See Loumiet*, 948 F.3d at 382.

Expounding on the restricted boundaries of established *Bivens* contexts, the Supreme Court in *Abbasi* provided numerous examples of the ways in which a case might meaningfully differ from *Bivens*, *Davis*, and *Carlson*. *Abbasi*, 137 S. Ct. at 1860 (listing seven non-exhaustive factors). Even a case with "significant parallels to one of the [Supreme] Court's [three] previous *Bivens* cases," or a case presenting just a "modest" extension, "is still an extension" into a brand-new context. *Id.* at 1864; *see also Hernandez*, 140 S. Ct. at 743.

Plaintiff's *Bivens* case against the Attorney General contains several of the factors explicitly identified in *Abbasi* as indicative of a new context; thus, it broadly and meaningfully differs from the trio of Supreme Court *Bivens* cases decided over 40 years ago. In Count 1, Plaintiff alleges that the Attorney General violated his First Amendment rights to "assemble, protest, and demonstrate." But the Supreme Court has "never held that *Bivens* extends to First Amendment claims." *Loumiet*, 948 F.3d at 382 (internal quotation marks and citation omitted). Instead the Court has repeatedly reminded litigants that it has *not* expressly extended a First Amendment *Bivens* claim under any of its clauses to any context—including the presidential-security context. *See Moss*, 572 U.S. at 757; *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012); *Iqbal*, 556 U.S. at 675; *Bush v. Lucas*, 462 U.S. 367, 368 (1983). That alone establishes that Plaintiff's First Amendment claim arises in a new context; the D.C. Circuit recognized as much when dismissing a similar claim under the Free Speech Clause. *Loumiet*, 948 F.3d at 382. This Court held the same earlier this year. *See Lee v. Barr*, No. 19-CV-2284 (DLF), 2020 WL 3429465, at *6 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5221 (July 23, 2020).

It is "glaringly obvious" that Plaintiff's Fourth Amendment *Bivens* claim (Count 2) presents a new context as well. *Hernandez*, 140 S. Ct. at 743. While *Bivens* itself was a Fourth

Amendment case, "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Id.* (collecting cases). The Supreme Court in *Abbasi* expressly clarified that *Bivens* authorizes damages for Fourth Amendment violations only in the narrow "search-and-seizure context in which [that case] arose"—*i.e.*, a claim against line-level narcotics agents for "handcuffing a man in his own home without a warrant." 137 S. Ct. at 1856, 1860. *Bivens* simply did not contemplate anything like the concerns at stake in Plaintiff's suit against the Attorney General for actions designed to ensure the President's safety.

Moreover, Plaintiff's lawsuit here "assume[s] dimensions far greater than those present in *Bivens* itself" in at least three other areas. *Id.* at 1861. First, "a 'new context' is present whenever the plaintiff seeks damages from a 'new category of defendants.'" *Loumiet*, 948 F.3d at 382 (quoting *Abbasi*, 137 S. Ct. at 1857) (citing *Meshal v. Higgenbotham*, 804 F.3d 417, 424 (D.C. Cir. 2015)). The Attorney General, a Cabinet member and the Nation's top law-enforcement official, is the quintessential example of a new *Bivens* defendant. *Abbasi*, 137 S. Ct. at 1860. As this Court recently held, claims against "high-ranking, government officials within the executive branch" are meaningfully different from those filed against the "line-level" agents in *Bivens*. *LKQ Corp. v. United States*, No. 18-CV-1562 (DLF), 2019 WL 3304708, at *11 (D.D.C. July 23, 2019) (dismissing the Attorney General).

Second, "the extent of judicial guidance" regarding how the Executive Branch should have "respond[ed] to the problem or emergency" in this case is markedly different from the guidance available to line-level officers in *Bivens*. *Abbasi*, 137 S. Ct. at 1860. In *Bivens*, the question was whether a line-level officer could enter a home without a warrant, consent, or exigent circumstances—a question that had been extensively addressed by courts at the time. Indeed, the prohibition on "the physical entry of the home" has deep historical and constitutional

roots: it is the "chief evil against which the wording of the Fourth Amendment is directed," and in no setting "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 585, 589 (1980) (internal quotations marks and citation omitted).

Here, in contrast, the key question presented in Plaintiff's complaint is whether (consonant with the Fourth Amendment) the Attorney General, in consultation with high-level officials, can allegedly disperse thousands of unscreened protesters near the White House, at a time of unrest, minutes before the President and other officials walked by. *Cf. Moss*, 572 U.S. at 762-64 (granting qualified immunity to Secret Service agents at Presidential event). Not only has the Supreme Court declined to extend *Bivens* in this area, taking up that question would require the Court to engage in the sort of judicial balancing of policy considerations that is not appropriate in *Bivens* litigation: "[t]he decisions of the Supreme Court demonstrate the difficulty of balancing the vital right of protest against the legitimate governmental interests of public order and safety." *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1116 (D.C. Cir. 1969) ("*QAG I*") (collecting cases).

Third, Plaintiff's lawsuit inescapably raises "the risk of disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 137 S. Ct. at 1860. Protecting the President is "undoubtedly" an issue "of the utmost importance." *Stigile v. Clinton*, 110 F.3d 801, 803 (D.C. Cir. 1997). But the Executive Branch's ability to effectively perform that critical function would likely be compromised by judicial intrusion in the form of personal liability. The Supreme Court has already stated as much: "The risk of personal damages liability is more likely to cause an official to second-guess difficult but necessary decisions concerning national-security policy." *Abbasi*, 137 S. Ct. at 1861.

Ultimately, Plaintiff's claims against the Attorney General "bear little resemblance to the

three *Bivens* claims the [Supreme] Court ha[d] approved" 40-plus years ago. *Id.* at 1860. Instead, the national-security concerns inherent here invoke the Supreme Court's two most recent *Bivens* cases, in which the Court held there was no Fourth Amendment damages remedy available. In *Abbasi*, the Court held that high-level detention policy claims, including a Fourth Amendment strip-search claim, presented a new context to which *Bivens* should not be extended. 137 S. Ct. at 1853-54, 1858. And in *Hernandez*, the Court concluded that claims stemming from a fatal cross-border shooting "assuredly arise in a new context" and held that dismissal was warranted. 140 S. Ct. at 743-44. The context presented by Plaintiff's challenge to decisions made by the Attorney General to protect the President's safety is even more novel.

If "[e]ach" of these differences alone is enough to "present[] a new context," *Loumiet*, 948 F.3d at 382, taken together, they definitively establish that Plaintiff asks this Court to endorse a new cause of action; one that represents a substantial extension of this implied remedy into a novel area that implicates significant separation-of-powers concerns. Given that *Bivens* is now a distinctly "disfavored" remedy and subject to strict limitations, "[t]he newness" of the presidential-security context "should alone require dismissal of the plaintiff['s] damage claims" against the Attorney General. *Hernandez v. Mesa*, 885 F.3d 811, 818 (5th Cir. 2018), *aff'd*, 140 S. Ct. 735 (2020).

### C.  Special factors preclude a *Bivens* remedy in the presidential-security context.

While "the absence of any *Bivens* remedy in similar circumstances" is itself "highly probative" of the conclusion that Plaintiff's claims should be dismissed, *Meshal*, 804 F.3d at 426, analysis of the "special factors" identified in *Abbasi* further dictates that this Court should decline Plaintiff's invitation to create a new implied damages remedy and dismiss his claims. *Abbasi*, 137 S. Ct. at 1858.

The "central" special-factor inquiry derives from "separation-of-powers principles." *Id.* at

1857. As noted above and detailed below, in the national-security arena courts are not "well suited" to "weigh the costs and benefits of allowing a damages action to proceed," particularly against the Attorney General. *Id.* at 1858. Congress, which *is* well suited to the task, has never enacted the remedy Plaintiff seeks. But even if courts were suited to that legislative task, the availability of alternative processes is yet another "'convincing reason'" for this Court "'to refrain from providing a new and freestanding remedy in damages.'" *Id.* at 1858 (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

### i.       Courts should not intrude into sensitive matters of presidential security.

"National-security policy is the [Constitutional] prerogative of the Congress and President." *Abbasi*, 137 S. Ct. at 1861 (citations omitted). By extension, authorizing "money damages" for injuries arising from national-security decisions is the prerogative of Congress— not the courts. *Id.* National security implications are therefore a "special factor" that foreclose *Bivens* remedies in "cases 'involving the military, national security, or intelligence.'" *Meshal*, 804 F.3d at 425 (quoting *Doe*, 683 F.3d at 394). This case is no exception.

The "strength" of special factors based on "national security" or related concerns is "underlined by precedent beyond the *Bivens* cases[,]" even "before the creation of *Bivens* remedies." *Doe*, 683 F.3d at 394-95. The Supreme Court has repeatedly "cautioned that '[m]atters intimately related to . . . national security are rarely proper subjects for judicial intervention.'" *Id.* at 395 (quoting *Haig v. Agee*, 453 U.S. 280, 292 (1981)); *accord Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988). And few matters are more intimately related to national security than the nation's "overwhelming[] interest in protecting the safety" of the President or the security of White House. *Watts*, 394 U.S. at 707.

The "paramount interest" in the President's security has been "underscored in importance by the tragic assassinations" of four presidents. *QAG I*, 421 F.2d at 1117 (citing

*Watts*, 394 U.S. 705). "Few events debilitate the nation more than the assassination of a President." *Stigile*, 110 F.3d at 803. Injury to the President "does violence" not only to the person, but to "the stability of the nation" and "the democratic ideals that guide our system of government." *Berg v. Kelly*, 897 F.3d 99, 114 (2d Cir. 2018). It has "worldwide repercussions and affects the security and future of the entire nation." *Roy v. United States*, 416 F.2d 874, 877 (9th Cir. 1969).

Plaintiff's challenge to the Attorney General's alleged decision to disperse protesters near the White House at a time of unrest also implicates "the ability of the executive branch to function in an orderly fashion." *White House Vigil for ERA Comm.*, 746 F.2d at 1528. The presence of thousands of unscreened demonstrators across from the White House presented an intrinsic threat that the Attorney General had the discretion, and the duty, to evaluate; that is *especially* true if the decision were made, as alleged, so that the President could walk to Lafayette Square, regardless of the President's alleged reasons for taking that walk. *Cf. Moss*, 572 U.S. at 759 (observing "[o]fficers assigned to protect public officials must make singularly swift, on the spot, decisions whether the safety of the person they are guarding is in jeopardy") (quoting *Reichle*, 566 U.S. at 671 (Ginsburg, J., concurring)); *Roy*, 416 F.2d at 877. As the Supreme Court has recognized, any large crowd poses a threat to the President's safety due to the inherent and foreseeable risk of infiltration by bad actors; this was particularly true here given the unrest and illegal acts that had prompted the curfew. *See Moss*, 572 U.S. at 760 (discussing inherent security risk from "200 to 300 protesters [who] were within weapons range, and had a largely unobstructed view, of the President's location"). The "hazard to the security of the President" presented by any "public gathering" of thousands of demonstrators—especially at a time of unrest—simply cannot be denied or avoided. *Quaker Action Grp. v. Morton*, 516 F.2d 717, 731 (D.C. Cir. 1975) ("*QAG IV*").

Indeed, inherent security concerns would have undeniably existed even if the President hadn't delivered remarks at St. John's Church but instead remained at the White House while the protests continued. As the D.C. Circuit has long observed, the White House is "a unique situs for considerations of presidential and national security." *White House Vigil for ERA Comm.*, 746 F.2d at 1533. And since it is the "nerve center for America's national security network," it is "singularly exposed to potential terrorist attack." *Id.* These concerns are magnified by its location: "[T]he need for effective security in the vicinity of the White House is great, but the geographical position of the Mansion renders it inherently insecure." *Id.* Because protecting the White House is a "security problem of the greatest magnitude," courts have upheld a variety of First Amendment restrictions near or inside the White House perimeter. *Id.* at 1541 (approving restrictions on signs and parcels on White House sidewalk); *see also, e.g., QAG IV*, 516 F.2d at 731-33; *United States v. Musser*, 873 F.2d 1513 (D.C. Cir. 1989); *United States v. Caputo*, F. Supp. 3d 65, 72 (D.D.C. 2016). In short, the decision to clear Lafayette Park— whether to protect the President as he walked to St. John's Church, as alleged, or to expand the White House perimeter at a time of unrest—"unquestionably has national security implications" that "provide[] reason to hesitate before extending *Bivens* into this field." *Hernandez*, 140 S. Ct. at 747 (citing *Abbasi*, 137 S. Ct. at 1861).

The national-security implications in this field are unquestionably more pronounced than, for example, those that precluded a *Bivens* remedy earlier this year in *Hernandez*; there, the Supreme Court held that the parents of a boy shot and killed by a Border Patrol agent while he was allegedly playing with his friends on the Mexican side of the border could not bring an individual-capacity suit against the agent. *Id.* Apart from concerns about interfering in foreign affairs, *see id.* at 744-45, the Court noted that the case implicated important national security concerns such as preventing the illegal entry of persons, drugs, and other goods into the United

States, *id.* at 746. The Court concluded that the "conduct of agents positioned at the border has a clear and strong connection to national security," rendering a *Bivens* remedy unavailable for the boy's death. *Id.*

The conduct of the Nation's chief law-enforcement officer in protecting the President's safety has more than a clear and strong connection to national security—it is connected to a national interest of the "utmost importance." *Watts*, 394 U.S. at 707; *QAG I*, 421 F.2d at 1117; *Stigile*, 110 F.3d at 803. Judicial encroachment into this area would raise separation-of-powers concerns not easily dismissed: "If *Bivens* liability were to be imposed" by this Court for the Attorney General's alleged decisions to protect the President or the White House, then other "high officers who face personal liability for damages might refrain from taking urgent and lawful action" when required to protect present and future Presidents. *Abbasi*, 137 S. Ct. at 1863. This Court "must" be "especially wary before allowing a *Bivens* remedy that impinges" on the arena of presidential security. *Hernandez*, 140 S. Ct. at 744.

> ### ii. Congress legislated extensively to enhance presidential and White House security without creating a personal damages remedy in this context.

This Court should also decline to create a new *Bivens* remedy in this case because Congress has never authorized a damages remedy against federal officers who are charged with safeguarding the President or the White House. Given its frequent attention to the issue, it is clear that Congress's refusal has not been "'inadvertent[,]'" and judicial restraint is therefore required in the creation of a new damages remedy. *Abbasi*, 137 S. Ct. at 1843 (quoting *Schweiker v. Chilicky*, 487 U.S. 412, 432 (1988)).

Congress first appropriated funds for the President's protection in 1906, in the wake of recurring national tragedies that followed the Civil War: the assassinations of Presidents Lincoln, Garfield, and McKinley. *See* 34 Stat. 708 (1906). In 1913, Congress began yearly authorizations

for the President's permanent protection. *See* 38 Stat. 23 (1913). Since then, Congress has expanded those protections to other critical persons and places, including the White House. 18 U.S.C. §§ 3056; 3056A(a); *see also USSS History: 150 Years of Our History*, U.S. SECRET SERVICE, https://secretservice.gov/about/history/events/ (last visited Nov. 10, 2020); SHAWN REESE, CONG. RSCH. SERV., RL 34603, THE U.S. SECRET SERVICE: HISTORY AND MISSIONS (2014), https://crsreports.congress.gov/products/pdf/RL/RL34603.

In 1917, Congress took another significant step to enhance presidential security when making it a federal crime to threaten the President. 39 Stat. 919 (1917) (codified at 18 U.S.C. § 871). Though Congress recognized that its action made "criminal a form of pure speech," the restriction was justified by the Nation's "overwhelming" interest in presidential security. *Watts*, 394 U.S. at 707 (citing H.R. REP. NO. 652, 64th Cong., 1st Sess. (1916)). In light of the three previous assassinations, lawmakers had concluded that the President "ought to be protected in *every* way possible." 53 CONG. REC. 9378 (1916) (statement of Rep. Webb) (emphasis added).

President Kennedy's assassination in 1963 prompted another wave of legislative attention to the issue of presidential security. President Johnson established a commission headed by Chief Justice Warren to investigate the Kennedy assassination, which Congress fully empowered to subpoena witnesses and evidence. *See* 28 Fed. Reg. 12,789 (Dec. 3, 1963); Pub. L. No. 88-202, 77 Stat. 362 (1963). The Commission produced a 900-page report in which it offered numerous proposals, including that Congress make it a federal crime to assassinate the President. *See* REPORT OF THE PRESIDENT'S COMMISSION ON THE ASSASSINATION OF PRESIDENT KENNEDY, pp. 454-69 (1964) ("The Warren Commission Report").[3] Despite observing that those assigned to protect the President face "an immensely difficult and complex task," *id.* at 426, the Commission understood that there are limits: presidential security should be "thorough but

---

[3] *Available at* https://www.archives.gov/research /jfk/warren-commission-report/chapter-8.html.

inconspicuous," and "[t]he rights of private individuals must not be infringed," *id.* at 427. Those conspicuous observations notwithstanding, however, the Commission did *not* recommend enacting legislation to impose liability on federal officials who might cross the line performing their protective mission. *See id.* Nor did Congress pass legislation to do so.

Congress did, however, act quickly on the Warren Commission's proposals, by passing statutes making it a federal crime to assassinate the President and criminalizing remaining in restricted areas or disobeying law enforcement instructions to leave an area that the President is (or will be) visiting. *See* 18 U.S.C. §§ 1751, 1752; *e.g.*, *United States v. Bursey*, 416 F.3d 301, 304-09 (4th Cir. 2005); *Caputo*, 201 F. Supp. 3d at 68. And Congress wasn't done. In 1979, the House Select Committee on Assassinations released its own 600-page report. Like the Warren Commission, this Committee was "acutely aware" of "the problem of insuring that civil liberties are preserved, while affording adequate protection to the institutions of democratic society and to public figures." *Final Report: Summary of Findings and Recommendations, H. Select Comm. on Assassinations*, H.R. REP. NO. 95-1828, pt. 2, at 464 (1979) (citation omitted).[4] But despite noting that it was "mindful of the need to weigh the costs that could accrue the individual privacy, group protest, legitimate dissent, political competition and social change against the benefits of stronger protective measures[,]" the Committee's proposed reforms did not include a damages claim against federal officers. *Id.* at 464-73.

Threats to the President and the White House continue to attract the attention of Congress and the Executive Branch. For example, after the Oklahoma City bombing in 1995, the government closed the portion of Pennsylvania Avenue in front of the White House to vehicular traffic. *See* Closure of Streets, 31 C.F.R. § 413.1 (1995). The terrorist attacks on September 11,

---

[4] *Available at*: https://www.archives.gov/research/jfk/select-committee-report/part-3-recommendations.html#legislative.

2001, marked another seminal moment in presidential security. In the wake of the terrorist attacks, barriers were placed around White House entrances, and Pennsylvania Avenue was temporarily closed to pedestrians.[5] Congress also did its part, enacting significant and permanent reforms and convening hearings on security threats. Chief among them, Congress reorganized the Secret Service under the new Department of Homeland Security. Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135, 2224 (codified as amended at 6 U.S.C. § 381). This reinforced the notion that any presidential-security failure is a national-security failure, as later exemplified by Congressional scrutiny of a White House breach in which intruders snuck into a State dinner and took photos with the President. *See The U.S. Secret Service and Presidential Protection: An Examination of a System Failure: Hearing Before the H. Comm. on Homeland Sec.*, 111th Cong. (2009).[6]

In 2014, Congress held additional oversight hearings regarding a series of security breaches at the White House, including an incident in which an armed invader jumped the White House fence and walked inside. *See*, *e.g.*, *White House Perimeter Breach: New Concerns about the Secret Service: Hearing Before the H. Comm. on Oversight and Gov't Reform*, 113th Cong. (2014).[7] While the hearing covered the importance of keeping areas near the White House accessible to tourists and protesters alike, with 16 fence-jumpers in five years, there was a significant debate over additional fencing that might "include Pennsylvania and Lafayette being restricted." *See id.* (Statement of Chairman Issa).

---

[5] THE WHITE HOUSE HISTORICAL ASS'N, *History of the White House Fence*, https://www.whitehousehistory.org/press-room/press-timelines/history-of-the-white-house-fence (last visited Nov. 10, 2020).

[6] *Available at*: https://www.govinfo.gov/content/pkg/CHRG-111hhrg55808/pdf/CHRG-111hhrg55808.pdf.

[7] *Available at*: https://www.govinfo.gov/content/pkg/CHRG-113hhrg91798/html/CHRG-113hhrg91798.htm.

Following the hearing, an executive panel issued a report on these White House breaches and echoed Congress's concern that presidential security "allows no tolerance for error" as a "single miscue, or even a split-second delay, could have disastrous consequences for the Nation and the world." United States Secret Service Panel, *Report from the United States Secret Service Protective Mission Panel to the Secretary of Homeland Security* 1 (Dec. 15, 2014).[8] Drawing on prior recommendations (including from the Warren Report), the panel offered many proposals, such as new fencing and a zero-tolerance disciplinary system. *Id.* at 7-8.

Finally, in the spirit of the oversight reforms discussed above, Congress has authorized Inspectors General throughout the Executive Branch to investigate and report abuses by federal law-enforcement officers. *See* The Inspector General Act of 1978, 5 U.S.C. App. 3 § 12; *see also id.* § 8E (DOJ). This includes alleged abuses of civil rights and liberties by DOJ officials. *See* USA Patriot Act, Pub. L. No. 107-56, § 1001(3), 115 Stat. 272, 391 (2001). Congress has likewise required Homeland Security to investigate and report constitutional abuses. 6 U.S.C. §§ 111(b)(1)(G), 113(d)(3), & 345. Despite creating these oversight processes, Congress has remained silent regarding the creation of a damages remedy against Justice Department, Secret Service, or any other federal officers for alleged abuses arising from actions to protect the President.

Congress's repeated "silence" in this regard is "telling" and further counsels against the extra-statutory remedy Plaintiff seeks here. *Abbasi*, 137 S. Ct. at 1862. In *Abbasi*, the Supreme Court observed that Congress's failure to provide damages to aliens claiming they were harshly treated after the 9/11 terrorist attacks counseled against *Bivens* relief. *Id.* Congress's attention to

---

[8] The executive summary is the only non-classified portion. It is available at: http://www .dhs.gov/sites/default/files/publications/14_1218_usss_pmp.pdf (last visited Nov. 10, 2020); *see also* United States Secret Service Protective Mission Panel, 79 Fed. Reg. 63,141 (Oct. 22, 2014).

the issue was extensive—for example, Congress had authorized DOJ's Inspector General to report on "abuses of civil rights and civil liberties in fighting terrorism." *Id.* (internal quotation marks and citations omitted). Despite "'frequent and intense'" attention to the issue for 16 years, "Congress fail[ed] to provide a damages remedy." *Id.* (quoting *Schweiker*, 487 U.S. at 425).

Congress's failure to provide a damages remedy is even more evident here: Since the early 1900s, Congress has approved federal protection and appropriated funds for presidential security, authorized or empowered committees and commissions to make findings and recommendations on presidential assassinations, and debated the balance between preserving civil liberties and enhancing presidential and White House security. But "'[a]t no point'" in more than a century of attention to the issue "'did Congress choose to extend to any person the kind of remedies'" that Plaintiff seeks. *Id.* (quoting *Schweiker*, 487 U.S. at 426). If "Congress has legislated pervasively on a particular topic but has not authorized the sort of suit that a plaintiff seeks to bring under *Bivens*," as here, respect for the separation of powers demands that courts not imply a remedy. *Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir. 2014); *see also Hernandez*, 140 S. Ct. at 750.[9]

---

[9] Congress's attention to this issue remains frequent and intense. Notably, Congress has held several hearings on the underlying incident, and the Justice Department's Inspector General (at the urging of some in Congress) has also opened an investigation. The Attorney General testified to Congress that the decision to disperse the protesters was based on an earlier-devised plan within the Executive Branch to expand the White House perimeter and to install fencing at Lafayette Square. *Oversight of the Department of Justice: Hearing Before the H. Comm. on the Judiciary*, 116th Cong. (2020), *available at*: https://www.rev.com/blog/transcripts/house-judiciary-committee-hearing-of-attorney-general-barr-transcript-july-28 at 02:17:46-02:20:38 (last visited Nov. 10, 2020). This plan was formulated after days of "[v]ery violent" and "unprecedented rioting right around the White House" in which approximately 90 federal officers were injured. *Id.* Whatever the subjective reason was for clearing the protesters (accommodating the President's request for a photo, protecting the White House, or both), Plaintiff cannot sue the Attorney General personally for any alleged role in that decision.

### iii.   This suit would invite intrusive discovery into the Attorney General's decision making and his confidential communications with the President.

The Supreme Court has long observed that "the harm produced by 'dampen[ing] the ardor of [public officials] in the unflinching discharge of their duties[]' is particularly severe in the national security field." *Halperin v. Kissinger*, 807 F.2d 180, 187 (D.C. Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). And the "accommodation for reasonable error" in the unflinching discharge of public duties "is nowhere more important than when the specter of Presidential assassination is raised." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991). But invoking an extra-statutory remedy as a means to probe the motives, discussions, and deliberations underlying the Attorney General's alleged decision to disperse Lafayette Square—notwithstanding the specter of thousands of unscreened protesters "within weapons range" of the President and White House—would hardly accommodate the Supreme Court's concerns. *Moss*, 572 U.S. at 763.

Plaintiff's core claim is that the Attorney General, the President, and senior officials, motivated by animus towards the protestors' racial-justice stance, made the decision to facilitate the presidential photo opportunity by forcefully removing the protestors from Lafayette Square. Compl. ¶¶ 3, 21-24, 29-31, 33, 51, 60-61. Inevitably, Plaintiff will seek discovery into the decision-making process and precise motives of the federal defendants. *See id.* ¶¶ 51-53. But probing the reasons underlying the Attorney General's alleged order to clear Lafayette Square "necessarily require[s] inquiry and discovery into the whole course of the discussions and deliberations" underpinning the "governmental acts being challenged." *Abbasi*, 137 S. Ct. at 1860. The necessity of that inquiry counsels against recognition of Plaintiff's urged damages remedy for at least two reasons.

First is "the time and administrative costs attendant upon intrusions resulting from the discovery and trial process." *Abbasi*, 137 S. Ct. at 1856. This is especially relevant here because

Plaintiff wishes to subject the Attorney General—and by extension the President, the Secretary

of Defense, and other high-level officials—to depositions and other burdens of discovery. As

noted above, "the burden and demand of litigation might well prevent them—or, to be more

precise, future officials like them—from devoting the time and effort required for the proper

discharge of their duties." *Id.* at 1860 (citing *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367,

382 (2004)). That in turn could chill Executive Branch officials from "taking every possible

precaution to ensure that [the President] is safe." *Stigile*, 110 F.3d at 804. That issue is simply

"too difficult" and "too delicate" for this Court to impose *personal* damages liability when

Congress has failed to do so. *Quaker Action Grp. v. Morton*, 460 F.2d 854, 860 (D.C. Cir. 1971)

("*QAG III*").

A "closely related problem" arises because the "discovery and litigation process would

either border upon or directly implicate the discussion and deliberations that led to the formation

of" decision-making by the Attorney General. *Abbasi*, 137 S. Ct. at 1860-61 (citing *Fed. Open*

*Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 360 (1979)). This problem is

unavoidable here, as Plaintiff alleges that the Attorney General was acting on orders from the

President. Compl. ¶ 4. Disclosing confidential communications between the President, the

Attorney General, and other cabinet officials—particularly regarding presidential or White

House security—could "interfere in an intrusive way with sensitive functions of the Executive

Branch." *Id.* at 1861 (citing *Clinton v. Jones*, 520 U.S. 681, 701 (1997)). As the Supreme Court

reaffirmed in *Abbasi*, "'special considerations control' when a case implicates 'the Executive

Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality

of its communications.'" *Id.* (quoting *Cheney*, 542 U.S. at 385). Those special considerations

double as special factors counselling against recognizing a new implied damages remedy here.

Courts in this district recently dismissed *Bivens* claims against a former Attorney General

based on similar concerns. *See Mejia-Mejia v. U.S. Immigr. & Customs Enf't*, No. CV 18-1445 (PLF), 2019 WL 4707150 (D.D.C. Sept. 26, 2019); *K.O. v. U.S. Immigr. & Customs Enf't*, --- F. Supp. 3d --- , No. CV 20-309 (RC), 2020 WL 3429697 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020). In *Mejia-Mejia*, the court warned of a chilling effect "[i]f the courts were to entertain challenges to Executive Branch policies that are pursued through personal lawsuits against the officials of departments and agencies of government." 2019 WL 4707150, at *5. In particular, "the discovery required to gain details on individual defendants' motivations could dampen the candor of conversations and advice rendered by officials within the executive branch." *Id.* But those concerns are even more pronounced in *this* case given that Plaintiff's claims "reach even further into Executive Branch deliberations," and the "conversations and advice at issue" are not only "closer to the office of the President" but involve the President himself. *K.O.*, 2020 WL 3429697, at *10. Whether or not these conversations are "privileged or discoverable," they provide "more reason to pause before allowing a *Bivens* action that could reach them." *Id.*; *cf. Lillemoe v. U.S. Dep't of Agric., Foreign Agric. Serv.*, 344 F. Supp. 3d 215, 232-33 (D.D.C. 2018) (declining to extend *Bivens* to "high-level policy determinations").

Because bad motive "is easy to allege and hard to disprove," Plaintiff's *Bivens* claims may require scrutiny into the Attorney General's communications with the President or intelligence regarding threats to the White House and the President. *Crawford-El v. Britton*, 523 U.S. 574, 584-85 (1998) (internal quotations marks and citation omitted). Given the "high rank[]" of the Attorney General, it is hard to "see how prosecution of [Plaintiff's] claims could avoid looking into" deliberations and decisions made "at the highest levels[.]" *K.O.*, 2020 WL 3429697, at *10. Yet that is the crux of this case. Even if the Attorney General later received immunity, litigation would subject high-level communications and sensitive material to "judicial and public scrutiny" via a cause of action Congress has never approved. *Wilson v.*

*Libby*, 535 F.3d 697, 710 (D.C. Cir. 2008); *cf. Stanley*, 483 U.S. at 682-83 (discovery into

military decisions counseled against *Bivens*); *Moss*, 572 U.S. at 762 (examining security manual

before granting immunity).

### iv.   Plaintiff pursues alternative relief that precludes a new *Bivens* remedy.

Another "'convincing reason'" why this Court should not step into Congress's or the

Executive Branch's shoes by creating a "'freestanding remedy'" against the Attorney General is

that Plaintiff has an "'alternative, existing process'" to vindicate his interests. *Abbasi*, 137 S. Ct.

at 1858 (quoting *Wilkie*, 551 U.S. at 550) (collecting cases). The "Supreme Court has declined

to extend *Bivens*" not only where Congress has provided a statutory remedy but also "where

other causes of action provide redress," including for "equitable relief." *Liff v. Off. of Inspector*

*Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 918 (D.C. Cir. 2018) (citations omitted). In this

case, Plaintiff seeks an injunction to protect both his First and Fourth Amendment rights, *see*

Prayer for Relief; the Supreme Court has observed that the opportunity to seek an "injunction"

is precisely the kind of alternative process that "usually precludes" extending *Bivens* into a new

context. *Abbasi*, 137 S. Ct. at 1865 (observing that detainees' ability to enjoin unconstitutional

conditions of confinement counsels against *Bivens* relief).

Numerous lower courts have applied this precedent and declined to extend *Bivens* where

equitable relief was an alternative option for vindicating constitutional interests. For example, in

*Mejia-Mejia*, the court observed that in the "numerous cases" of immigrant children separated

from their parents (including "two class actions") the availability of "alternative mechanisms"

precluded *Bivens* relief. 2019 WL 4707150, at *5. Those alternative mechanisms included the

very relief sought here: "injunctive relief against the relevant agencies and government officials

in their official capacities[.]" *Id*. Likewise, this Court has twice observed that equitable relief

under the Administrative Procedure Act is enough to preclude *Bivens* relief, "perhaps alone."

*LKQ Corp.*, 2019 WL 3304708, at *11 (citing *Lillemoe*, 344 F. Supp. 3d at 232). The availability of equitable relief, under the APA or otherwise, "leaves no room for *Bivens*." *W. Radio Servs. Co. v. U.S. Forest Serv.*, 578 F.3d 1116, 1123 (9th Cir. 2009); *accord Nebraska Beef, Ltd. v. Greening*, 398 F.3d 1080, 1084 (8th Cir. 2005); *Miller v. U.S. Dep't of Agric. Farm Servs. Agency*, 143 F.3d 1413, 1416 (11th Cir. 1998).

Moreover, it is immaterial whether Plaintiff's proposed injunction is "adequate to provide all of the relief" he seeks. *Liff*, 881 F.3d at 920. So long as Plaintiff has at least an "avenue for some redress" through his proposed injunction, "bedrock principles of separation of powers foreclose[] judicial imposition of a new substantive liability." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001). Indeed, a *Bivens* remedy is not necessarily warranted even when the available alternatives offer "no relief whatsoever." *Davis v. Billington*, 681 F.3d 377, 383 (D.C. Cir. 2012) (citing *Wilson*, 535 F.3d at 709). "[E]ven if the choice is between *Bivens* or nothing, if special factors counsel hesitation"—as they do here—"the answer may be nothing." *Meshal*, 804 F.3d at 425.

In this case, however, the Plaintiff may have a potential alternative mechanism for attempting to seek recourse even if he fails to obtain an injunction: depending on the facts, he could attempt to pursue a damages claim under state tort law or the Federal Tort Claims Act, 28 U.S.C. § 1346(b), *id.* §§ 2671-80. While the Supreme Court in 1980 ruled that the FTCA is not an alternative process to *Bivens*, *see Carlson*, 446 U.S. at 23, the Supreme Court has since held or observed—on at least *four* occasions since *Carlson*—that the potential availability of "state tort law" may "provide[] alternative means for relief" precluding a new *Bivens* remedy. *Abbasi*, 137 S. Ct. at 1858; *see Minneci v. Pollard*, 565 U.S. 118, 120 (2012); *Wilkie*, 551 U.S. at 551; *Malesko*, 534 U.S. at 72-73. The D.C. Circuit recently observed the same thing. *See Liff*, 881 F.3d at 918 (citing *Minneci*).

Consequently, many courts have now held that the FTCA is an alternative to *Bivens* in a

variety of contexts, observing "that *Carlson*'s analysis of that issue may not have survived [*Abbasi*]." *Oliveras v. Basile*, 440 F. Supp. 3d 365, 373 (S.D.N.Y. 2020) (collecting cases); *e.g.*, *Oliva v. Nivar*, 973 F.3d 438, 443-44 (5th Cir. 2020) (holding that the FTCA alone precluded a *Bivens* claim based on excessive force). Because Plaintiff's allegation that he was seized unlawfully "would be so clearly actionable under the general law" (subject to potential FTCA defenses), his case presents the "weakest argument" for this Court to "recogniz[e] a generally available constitutional tort." *Wilkie*, 551 U.S. at 560. Whether or not this Court recognizes state law or the FTCA as providing a potential standalone alternative to *Bivens*, the possible availability of a cause of action for damages there (or against state actors under federal civil rights statutes like 42 U.S.C. § 1983)—when paired with all of the special factors above— provides even more reason for this Court to decline Plaintiff's invitation to create a new implied cause of action. *See Abbasi*, 137 S. Ct. at 1861; *cf. Meshal*, 804 F.3d at 425 (special factors that might not "alone" preclude *Bivens* may do so "together").

"In sum, this case features multiple factors that counsel hesitation about extending *Bivens*, but they can all be condensed to one concern—respect for the separation of powers." *Hernandez*, 140 S. Ct. at 749 (citing *Abbasi*, 137 S. Ct. at 1857-58). When it comes to the President's safety and White House security, Congress is "in a far better position than a court to evaluate the impact of a new species of litigation against those who act on the public's behalf." *Wilkie*, 551 U.S. at 562 (internal quotation marks and citation omitted). Imposing a judicially implied damages remedy in an area that Congress has resisted for a century would mark a return to the "forgotten era in which courts freely implied private rights of action to promote congressional purposes unmoored from statutory text." *LKQ Corp.*, 2019 WL 3304708, at *10. Because there are "sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy" against the Attorney General for the claims pleaded in this novel context, this

Court "must refrain from creating the remedy." *Abbasi*, 137 S. Ct. at 1858.

> **II.   The Attorney General is entitled to qualified immunity because Plaintiff fails to allege that he was personally involved in violating Plaintiff's clearly established constitutional or statutory rights.**

The Attorney General is likewise entitled to qualified immunity because it is not plausibly alleged that he was personally involved in Plaintiff's removal from Lafayette Square, and clearing thousands of unscreened protesters within weapons range of the President and the White House during a time of civil unrest did not otherwise violate clearly established law. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). To overcome it, the Plaintiff must allege facts demonstrating that: (1) the defendant violated his statutory or constitutional rights; and (2) "the right at issue was clearly established at the time of [the] defendant's alleged misconduct." *Id*. at 232 (internal quotation marks and citation omitted). The court has discretion to decide which prong to address first. *See id.* at 236.

For a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate[,]'" such that "'every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle*, 566 U.S. at 664 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "[T]he right allegedly violated must be established, not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official[.]" *Id*. at 665 (internal quotation marks and citations omitted). Thus, qualified immunity "protect[s] all but the plainly incompetent or those who knowingly violate the law." *Hunter*, 502 U.S. at 229 (internal quotation marks and citation omitted); *see Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018).

**A. The allegations do not plausibly show the Attorney General's personal involvement in violations of clearly established constitutional rights.**

Under *Bivens*, there is no vicarious liability. *See Iqbal*, 556 U.S. at 676. Hence, to survive a dismissal motion the Plaintiff "must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* Allegations of personal involvement are doubly critical to claims against high-ranking officials, because their supervision of subordinates nationwide rarely entails involvement in line-level employees' particular actions, and they should not be lightly diverted from their responsibilities to answer conclusory claims. *See id.* at 676-77, 683, 685; *al-Kidd*, 563 U.S. at 745-46 (Kennedy, J., concurring).

A supervisor cannot be liable for a subordinate's retaliatory acts or First Amendment content discrimination unless the supervisor directly instructed the officer to suppress the plaintiff's speech for retaliatory reasons. *See Surita v. Hyde*, 665 F.3d 860, 867, 880 (7th Cir. 2011); *see generally Bundy v. Sessions*, 387 F. Supp. 3d 121, 124, 129-30 (D.D.C. 2019), *aff'd*, 812 F. App'x 1 (D.C. Cir. 2020). Similarly, a government official cannot be liable for a subordinate's Fourth Amendment violation in seizing or using force unless the supervisor knew the circumstances rendering the force excessive and approved the particular tactics at issue. *Cf. Int'l Action Ctr. v. United States*, 365 F.3d 20, 28 (D.C. Cir. 2004) (in First Amendment context, observing that "[t]he supervisor[ ] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see") (internal quotation marks and citation omitted); *cf. Tracy v. Neuberger*, 840 F. Supp. 2d 1183, 1190-91 (D. Minn. 2012) (granting qualified immunity as no causal connection was shown between supervisor's mass arrest order and the allegedly unlawful conduct of line officers arresting plaintiff). Thus, a supervisor's alleged generalized order to arrest or move people does not, without more, render him liable for line-level officers' tactics. *See Haus v. City of New York*, No. 03 CIV 4915, 2011

28

U.S. Dist. LEXIS 155735, at *187-89, 196-97 (S.D.N.Y. Aug. 31, 2011); *cf. McNair v. Coffey*, 279 F.3d 463, 466-67 (7th Cir. 2002) (affirming qualified immunity for officer who requested backup as he was not responsible for the number of officers who held the suspect at gunpoint).

To determine the sufficiency of the allegations of the Attorney General's involvement in the clearing of Lafayette Square and his entitlement to qualified immunity, the first step is to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The allegation that the Attorney General "personally issued the order that caused the damages alleged herein[,]" Compl. ¶ 8, is a conclusion not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 679-81. And this conclusory statement is the only allegation suggesting that the Attorney General was personally—even tangentially—involved in the line-level officers' purported seizure of Plaintiff, use of force, or suppression of speech. Factually, the complaint alleges only that the Attorney General entered the park, met with unidentified officials, and pointed at St. John's Church. Compl. ¶¶ 29-31. The Complaint also alleges that the Justice Department "subsequently acknowledged that Attorney General Barr personally ordered that Lafayette Square be cleared of all demonstrators." *Id.* ¶ 43. But the most that can be reasonably inferred from this is that the Attorney General expressed a desire that someone would "clear" the park, *i.e.*, have *everyone* leave the park by peaceful means (regardless of their views). *See id.* It cannot plausibly be inferred that the Attorney General ordered any unlawful arrest, use of force, or punishment of the protesters—much less the Plaintiff specifically—based on personal opposition to or desire to suppress their message. Thus, the complaint has not adequately alleged the Attorney General's personal involvement in the officers' challenged conduct.

**B.  There is no clearly established First Amendment violation.**

Plaintiff's claim against the Attorney General independently fails because Plaintiff has

not alleged the violation of any clearly established First Amendment right. Under the First Amendment, the government may establish reasonable restrictions on the time, place, and manner of protected speech. *See Hill v. Colorado*, 530 U.S. 703, 719-20 (2000). As the Supreme Court explained in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), time, place, and manner restrictions are valid provided that they are "'justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Id*. at 791 (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)); *see A.N.S.W.E.R. Coal. (Act Now to Stop War & End Racism) v. Basham*, 845 F.3d 1199, 1208 (D.C. Cir. 2017). A restriction is content neutral if it "serves purposes unrelated to the content" of the speech regardless of whether "it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791 (citation omitted).

Under *Ward's* narrow tailoring/significant interest prong, "the significance of the government interest bears an inverse relationship to the rigor of the narrowly tailored analysis." *Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1221 (10th Cir. 2007). A restriction is narrowly tailored if it does not "burden[ ] substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799; *see Time Warner Ent. Co., L.P. v. FCC*, 93 F.3d 957, 978-79 (D.C. Cir. 1996). But the regulation "need not be the least restrictive or least intrusive means" of furthering the government's interests. *Ward*, 491 U.S. at 798.

"[T]he safety of the President [i]s a 'paramount interest,'" *White House Vigil for ERA Comm.*, 746 F.2d at 1532-33 (citations omitted), justifying substantial limitations on the manner of expression. *See Moss*, 572 U.S. at 748, 758-59, 761; *Watts*, 394 U.S. at 707-08. The government also has a related, and additional, strong interest in protecting the White House and

its occupants. *See QAG IV*, 516 F.2d at 726-27, 729. Both of these interests have previously justified substantial limitations on the manner of expressive activity in Lafayette Square, which abuts the White House grounds, and in other areas in and around the White House. *See White House Vigil for ERA Comm.*, 746 F.2d at 1532-41; *QAG IV*, 516 F.2d at 727-34; *see also Musser*, 873 F.2d at 1516-19; *Caputo*, 201 F. Supp. 3d at 71-72.

Here, the Attorney General's alleged order to federal law enforcement officers to "clear" Lafayette Square did not violate any clearly-established First Amendment right. The complaint alleges only that the Attorney General directed a one-block extension of the security perimeter around the White House, a step that logically furthered White House security and the President's protection before he appeared in Lafayette Square. *See* Compl. ¶¶ 18, 29-30, 43. No Supreme Court decision, D.C. Circuit decision, or consensus of persuasive authority, *Wilson v. Layne*, 526 U.S. 603, 617 (1999); *Lash v. Lemke*, 786 F.3d 1, 7 (D.C. Cir. 2015), clearly established that the First Amendment forbade the Attorney General to issue an on-the-spot crowd clearing order covering a one-block area in response to the need to protect the President and the White House in the face of a large crowd of unscreened protesters. In fact, there appears to be no reported decision at all evaluating the constitutionality of a high-ranking official's on-the-spot clearing order near the White House, much less in this particular situation.

On the other hand, the Supreme Court has held that law enforcement agents did not violate any clearly established First Amendment rights when they moved protestors a block away from a restaurant after then-President Bush spontaneously decided to stop in for dinner. *Moss*, 572 U.S. at 754. The Supreme Court held that the *Wood* plaintiffs' allegations of viewpoint discrimination—that the agents moved presidential protestors further away from the restaurant than presidential supporters—did not amount to a violation of clearly established law. *Id.* at 748-49, 759-60. Because the agents' primary duty was to protect the president, there was

no precedent requiring the agents to take any specific steps to provide a "comparable location" to the two groups of demonstrators, and the order to create the security perimeter was facially neutral, the agents were entitled to immunity. *Id.*

The parallels to this case are readily apparent. The order to clear the protestors from Lafayette Square was facially neutral and directly served the interest of White House security and the President's safety—and unlike *Moss*, where the protestors were uniformly peaceful, the protests in Lafayette Square took place during a period of sometimes-violent civil unrest. No established law required the Attorney General to take supposedly less-restrictive measures, or to argue with the President about walking through Lafayette Square. *See id.* at 760-61. Thus, Plaintiff's First Amendment claim should be dismissed on qualified-immunity grounds.

Furthermore, against the legal backdrop of the *Ward* framework the Attorney General could have reasonably believed that his alleged conduct implicated none of the speech concerns Plaintiff raises here. The Attorney General's alleged order was content neutral on its face because it excluded all people from the park, regardless of what views they expressed. *See Hill*, 530 U.S. at 719; *Clark*, 468 U.S. at 295-96; *Basham*, 845 F.3d at 1208-09. Plaintiff implies otherwise by citing *the President's* statements addressing violent unrest to speculate that the President disapproved of the protests. But none of the statements made by the Attorney General suggest any intention or desire to use force against peaceful protestors. Compl. ¶¶ 21-22, 23; *see also Moss*, 572 U.S. at 763-64; *cf. Iqbal*, 556 U.S. at 682-83.

Plaintiff's own allegations also establish the significance of the governmental interests served by removing everyone from the park. The complaint asserts that the Attorney General directed that the park be cleared allegedly to enable the President to walk to St. John's Church to

deliver a speech. *See* Compl. ¶¶ 3, 30, 39-42.[10] At least two compelling governmental interests were served by the Attorney General's alleged order: (1) protecting the President as he walked to the church and delivered remarks; and (2) protecting the White House in response to disorder in the area. The government's interest in presidential protection was especially acute. The President was about to appear in public, which carries "the greatest danger." *In re Sealed Case*, 148 F.3d 1073, 1078 (D.C. Cir. 1998). While there had been peaceful protests in the days immediately before June 1, 2020, there had also been looting, rioting and vandalism in what the Mayor described as a "glorification of violence" that was "not representative of peaceful protest or individuals exercising their lawful First Amendment rights." Mayor's Order 2020-68 § I ¶ 4. Indeed, to prevent further rioting, the Mayor ordered a 7:00 p.m. curfew on June 1 because an 11:00 p.m. curfew had proven ineffective the night before. *See* Mayor's Order 2020-69 § II ¶ 1; Mayor's Order 2020-68 § II ¶ 1. The recent unrest attending the protests heightened the possible danger to the President in entering the park; similarly, given the unrest near the White House, the government had a substantial interest in protecting the White House, with its vital occupants and operations, from the potential danger posed by an unscreened crowd of thousands.

The Attorney General's alleged order to clear the park directly advanced those interests by preventing the protesters from entering within weapons distance of the President or endangering security officers and physical barriers protecting the White House. *See generally Moss*, 572 U.S. at 760-62; *Marcavage v. City of New York*, 689 F.3d 98, 105-07 (2d Cir. 2012). While Plaintiff alleges that the defendants were motivated by the desire to suppress the protestors' First Amendment speech, the "obvious alternative explanation" is that the Attorney General's alleged order to have the square cleared was to ensure the safety of the President.

---

[10] The Attorney General disputes Plaintiff's allegation that he cleared the park for the purpose of allowing the President to deliver his remarks there. But even assuming the truth of Plaintiff's allegations, as we must at this stage, the governmental interest in protecting the President would clearly support the Attorney General's alleged actions.

*See Iqbal*, 556 U.S. at 682.  Nor did the order substantially burden more speech than was necessary. Notably, while courts have upheld time, place, and manner restrictions of unlimited duration, the Attorney General's alleged order was temporary and therefore even less restrictive than most such limitations. *Cf. White House Vigil for ERA Comm.*, 746 F.2d at 1537-41. And the order was narrowly tailored, leaving adequate alternative channels, including protests in virtually any other permissible location. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1133-39 (9th Cir. 2005).

Lastly, allegations that line-level officers used excessive force to clear the park do not clearly establish that the Attorney General's order violated the First Amendment. Conclusory use of force allegations do not alone transform an otherwise neutral restriction on speech into impermissible retaliation or viewpoint discrimination. *See Sevy v. Barach*, 815 F. App'x 58, 64 (6th Cir. 2020); *see also Lash*, 786 F.3d at 10 ("A plaintiff pressing a First Amendment retaliatory force claim must show, among other things, that the officer who used force against him had 'retaliatory animus.'") (citations omitted). And as already explained, Plaintiff has not plausibly alleged that the Attorney General directed the force Plaintiff says was used. Nor does the complaint allege specific facts showing that the officers, much less the Attorney General, had a retaliatory motive for using force. *See Lash*, 786 F.3d at 9-10. Accordingly, the Attorney General is entitled to qualified immunity from Plaintiff's First Amendment claim.

### C.  There is no clearly established Fourth Amendment violation.

As previously explained, Plaintiff fails to allege facts plausibly showing the Attorney General was personally involved in the actions of the line-level officers who allegedly seized and used force against him. That alone is dispositive of Plaintiff's claim against the Attorney General. But qualified immunity bars the Fourth Amendment claims for additional reasons. At the intersection of presidential security, protest, and crime control that this case presents, no clear principle of law makes it indisputable that the officers used excessive force.

The general standards governing excessive force claims do not clearly establish that the officers could not forcibly disperse the crowd in Lafayette Square. The reasonableness of an officer's use of force to seize an individual depends on a "careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Significantly, the government's interest in presidential security weighs heavily in the Fourth Amendment balance and can justify forcible seizure without particularized suspicion of criminality. *See Berg*, 897 F.3d at 108-13 (qualified immunity for police officers who placed protesters in pens and noting presidential protection is a special need potentially justifying the detention); *cf. Saucier v. Katz*, 533 U.S. 194, 207-09 (2001) (qualified immunity from excessive force claim based on agent's allegedly seizing a protester and shoving him in a van to protect the Vice President); *Stigile*, 110 F.3d at 803-07 (presidential protection is a special need justifying random drug testing of employees with access to the White House). Separately, the government's interest in public order and law enforcement can sometimes permit law enforcement officers to "seize" in the Fourth Amendment sense a large cohesive crowd based on probable cause to believe that some, though not all, of its members engaged in criminal behavior, for example when acting as a unit. *See Bernini v. City of St. Paul*, 665 F.3d 997, 1003-04 (8th Cir. 2012); *cf. Carr v. District of Columbia*, 587 F.3d 401, 407-10 (D.C. Cir. 2009); *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1195 (9th Cir. 2015).

Here, because the government had a paramount interest in protecting the President during his arrival in the park and his speech at the church, that interest strongly supports the conclusion that the officers' use of force was lawful. *See generally Stigile*, 110 F.3d at 803-07; *cf. Moss*, 572 U.S. at 748, 758-59; *Berg*, 897 F.3d at 108-13. Additionally, based on the Mayor's reports about unrest in the days leading up to the clearing of the park (and the media reports cited by

Plaintiff), the officers could have thought it reasonable to use crowd control techniques to move the crowd in order to protect the President and further the government's interest in law enforcement and prevent bad actors from using the crowd as cover to endanger the officers. *See generally* 18 U.S.C. §§ 111(a)(1), 3056(d) (prohibiting even minor forcible, non-contact interference with federal officers' duties); *see also Lucas v. United States*, 443 F. Supp. 539, 544 (D.D.C. 1977), *aff'd*, 590 F.2d 356 (D.C. Cir. 1979). Ultimately, Plaintiff cannot point to binding cases clearly establishing that the officers used an unreasonable degree of force under the circumstances, and his Fourth Amendment *Bivens* claim should be dismissed on qualified immunity grounds. *See, e.g.*, *Bernini*, 665 F.3d at 1003-06; *Felarca v. Birgeneau*, 891 F.3d 809, 817-19 (9th Cir. 2018); *Young v. Akal*, 985 F. Supp. 2d 785, 801-03 (W.D. La. 2013); *see also White v. Jackson*, 865 F.3d 1064, 1079- 80 (8th Cir. 2017); *Dundon v. Kirchmeier*, No. 1:16-cv-406, 2017 WL 5894552, at \*17-19 (D.N.D. Feb. 7, 2017), *aff'd,* 701 F. App'x 538 (8th Cir. 2017); *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 373-74 (D.D.C. 2014).

## CONCLUSION

For the reasons stated above, Plaintiff's claims against the Attorney General should be dismissed with prejudice.

Dated:  November 10, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
Civil Division

DOUGLAS G. SMITH
Deputy Assistant Attorney General

C. SALVATORE D'ALESSIO, JR.
Acting Director, Torts Branch

*/s/* Kelly Heidrich
KELLY HEIDRICH
PA Bar No. 207407, under LCvR 83.2
Senior Trial Attorney

Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-4371; F: (202) 616-4314
Kelly.Heidrich@usdoj.gov

*/s/* David G. Cutler
DAVID G. CUTLER
IL Bar No. 6303130, under LCvR 83.2
Trial Attorney, Constitutional Torts Staff
Torts Branch, Civil Division
U.S. Department of Justice
Ben Franklin Station, P.O. Box 7146
Washington, D.C. 20044
T: (202) 616-0674; F: (202) 616-4314
David.G.Cutler@usdoj.gov

*Counsel for Attorney General William P. Barr in his individual capacity*