### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **RYAN ROTH, <u>et al</u>.** | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **Consolidated Case No. 1:20-cv-01622-DLF** |
| **DONALD J. TRUMP, <u>et al</u>.** | : | |
| **Defendants.** | : | |

### PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Patrick M. Regan #336107
pregan@reganfirm.com
Christopher J. Regan #1018148
cregan@reganfirm.com
Emily C. Lagan  #1645159
elagan@reganfirm.com
REGAN ZAMBRI LONG PLLC
1919 M Street, NW, Suite 350
Washington, DC 20036
PH: (202) 463-3030
FX: (202) 463-0667
*Counsel for Plaintiffs*

## TABLE OF CONTENTS

*Page*

PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

I.   Relevant Factual Background ......................................................................................... - 1 -

    A.  The Death of George Floyd .................................................................................. - 1 -

    B.  Peaceful Demonstrations in Lafayette Square: May 29, 2020 – May 31, 2020 ....... - 2 -

    C.  Defendants Encourage the Use of Force against Peaceful Protesters ...................... - 3 -

    D.  The June 1, 2020 Attack on Plaintiff and Other Peaceful Demonstrators in Lafayette Square ................................................................................................... - 4 -

        1.  Plaintiff Ryan Roth's Injuries ...................................................................... - 5 -

        2.  Plaintiff Isabella Kavanagh's Injuries ........................................................... - 6 -

    E.  Defendants' Response to the June 1 Attack ........................................................... - 8 -

    F.  The Nation Responds to the June 1 Attack ........................................................... - 9 -

II.  Legal Standard ............................................................................................................. - 11 -

III. Argument .................................................................................................................... - 12 -

    A.  The Official-Capacity Defendants' Motion to Dismiss should be denied because Plaintiffs have standing to bring their claims. ....................................................... - 13 -

        1.  Plaintiffs have alleged an ongoing injury sufficient to confer standing. ....... - 14 -

        2.  Additionally, Plaintiffs face substantial risk of future injury because of the Official-Capacity Defendants' demonstrated commitment to "dominating" protesters like Plaintiffs. ............................................................................ - 15 -

        3.  The substantial risk of harm to Plaintiffs is not speculative. ........................ - 17 -

    B.  Defendant Barr's Motion to Dismiss his individual-capacity claims should be denied because Plaintiffs do not seek a new damages remedy, and Defendant Barr is not entitled to qualified immunity. ..................................................................... - 19 -

        1.  Plaintiffs do not seek a new damages remedy. .............................................. - 19 -

a) *Bivens* remedies are available for the violations of Plaintiffs' First and Fourth Amendment rights. ....................................................................- 21 -

b) Defendant Barr is not a new category of defendant. ................................- 23 -

c) The extent of judicial guidance is no different than that in *Bivens*. .........- 23 -

d) Allowing a *Bivens* remedy for Plaintiffs' claims would not disrupt the functioning of the Executive Branch. .......................................................- 24 -

2. No special factors are present to question the availability of a Bivens remedy. ...........................................................................................................- 24 -

a) Plaintiffs' claims do not raise national security concerns. ........................- 24 -

b) Congress has not legislated extensively in the relevant field of protestor rights and remedies. ..............................................................................- 27 -

c) Plaintiffs' claims do not pose administrability concerns. .........................- 28 -

d) No alternative forms of relief provide redress for Plaintiffs' injuries. ....- 29 -

i. Prospective injunctive relief does not remedy the harm Plaintiffs already suffered. ...............................................................................- 29 -

ii. State tort law and the FTCA will not redress Plaintiffs' injuries. .......- 30 -

3. Defendant Barr is not entitled to qualified immunity. ...................................- 31 -

a) Defendant Barr personally violated Plaintiffs' constitutional rights. .......- 32 -

b) Defendant Barr violated Plaintiffs' clearly established First Amendment rights. ...................................................................................................- 33 -

i. Defendant Barr's order to forcibly clear Plaintiffs from Lafayette Square was not narrowly tailored. ....................................................- 34 -

ii. The creation of a photo opportunity is not a significant government interest. ..............................................................................................- 36 -

iii. Defendant Barr's order to forcibly clear Plaintiffs from Lafayette Square was not viewpoint neutral. ....................................................- 37 -

iv. Plaintiffs' First Amendment right to protest in Lafayette Square is clearly established. ...........................................................................- 38 -

c) Defendant Barr violated Plaintiffs' clearly established Fourth Amendment rights. ..................................................................................- 39 -

i.   Plaintiffs were seized when Defendants used military-grade weapons to clear them from Lafayette Square....................................- 39 -

ii.  Defendants used excessive force against Plaintiffs. ..........................- 40 -

iii. Plaintiffs' Fourth Amendment rights are clearly established. ...........- 42 -

IV.  Conclusion........................................................................................................- 43 -

CERTIFICATE OF SERVICE ............................................................................- 44 -

# TABLE OF AUTHORITIES

**Cases:**

*Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*,
    901 F.3d 356 (D.C. Cir. 2018) ........................................................................38

*Anderson v. Creighton*,
    483 U.S. 635 (1987) ........................................................................................32

*Aref v. Lynch*,
    833 F.3d 242 (D.C. 2016) ...............................................................................30

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ..........................................................................14

*Ass'n of Indep. Sch. of Greater Washington v. District of Columbia.*,
    311 F. Supp. 3d 262 (D.D.C. 2018) ................................................................39

*Attias v. Carefirst, Inc.*,
    865 F.3d 620 (D.C. Cir. 2017) ........................................................................16

*Barham v. Ramsey*,
    434 F.3d 565 (D.C. Cir. 2006) ...................................................32, 39, 41, 42

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................12

*Bivens v. Six Unknown Named Agents*,
    403 U.S. 388 (1971) .................................................................................passim

*Bloem v. Unknown Dep't of Interior Emps.*,
    920 F. Supp. 2d 154 (D.D.C. 2013) ...........................................................22, 23

*Bredlin v. California*,
    551 U.S. 249 (2007) ........................................................................................40

*Bush v. Lucas*,
    462 U.S. 367 (1983) ........................................................................................31

*Carlson v. Green*,
    446 U.S. 14 (1980) ...........................................................20, 23, 24, 31

*Chang v. United States*,
    2007 WL 2007335 (D.D.C. July 10, 2007) .....................................................19

*Chang v. United States*,
    738 F. Supp. 2d 83 (D.D.C. 2010) ..................................................................19

*Chien v. U.S.*,
    2019 WL 4602119 (D.D.C. Sept. 23, 2019) ...................................................31

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ................................................................................................*passim*

\*Clark v. Library of Cong,*,
    750 F.2d 89 (D.C. Cir. 1984) ............................................................................. 14, 16

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................................................................... 29

*Corr. Servs. Corp. v. Malesko*,
    534 U.S. 61 (2001) ................................................................................................. 20

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
    975 F.2d 871 (D.C. Cir. 1992) ............................................................................... 22

*Cruz v. Am. Airlines, Inc.*,
    356 F.3d 320 (D.C. Cir. 2004) ............................................................................... 30

\*Davis v. Passman*,
    442 U.S. 228 (1979) .......................................................................................... 23, 29

*Dearth v. Holder*,
    641 F.3d 499 (D.C. Cir. 2011) ............................................................................... 14

\*Dellums v. Powell*,
    566 F.2d 167 (D.C. Cir. 1977) .......................................................................... 19, 22

\*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ....................................................................................... 14, 16

*District of Columbia v. Wesby*,
    138 S. Ct. 577 (2018) ......................................................................................... 32, 43

*E.E.O.C. v. St. Francis Xavier Parocial Sch.*,
    117 F. 3d 621 (D.C. Cir. 1997) .............................................................................. 12

\*Elkins v. District of Columbia.*,
    610 F. Supp. 2d 52 (D.D.C. 2009) ......................................................................... 33

*Florida v. Bostick*,
    501 U.S. 429 (1991) ............................................................................................... 40

\*Fogarty v. Gallegos*,
    523 F.3d 1147 (10th Cir. 2008) ............................................................................. 43

*Graham v. Connor*,
    490 U.S. 386 (1989) ............................................................................................... 40

*Harris v. Sebelius*,
    932 F. Supp. 2d 150 (D.D.C. 2013) ....................................................................... 12

\*Hartley v. Wilfert*,
    918 F. Supp. 2d 45 (D.D.C. 2013) ..................................................................... 22, 39

*Headwaters Forest Def. v. Cty. of Humboldt,
    276 f.3d 1125 (9th Cir. 2002) ...................................................................43

Herbert v. Nat'l Acad. of Sci.,
    974 F.2d 192 (D.C. Cir. 1992) ...................................................................12

Hernandez v. Cremer,
    913 F.2d 230 (5th Cir. 1990) .....................................................................18

*Hobson v. Wilson,
    737 F.2d 1 (D.C. Cir. 1984) .......................................................................22

Hope v. Pelzer,
    536 U.S. 730 (2002), *partially abrogated on other grounds* ..........................32

In re Idaho Conservation League,
    811 F.3d 502 (D.C. Cir. 2016) ...................................................................16

Index Newspapers LLC v. U.S. Marshals Serv.,
    977 F.3d 817 (9th Cir. 2020) .....................................................................15

Initiative Referendum Inst. v U.S. Postal Serv.,
    417 F.3d 1299 (D.C. Cir. 2005) .................................................................36

Jacobs v. Vrobel,
    724 F.3d 217 (D.C. Cir. 2013) ...................................................................31

Jennings v. Jones,
    499 F.3d 2 (1st Cir. 2007)..........................................................................43

Jerome Stevens Pharm., Inc. v. Food & Drug Admin.,
    402 F.3d 1249 (D.C. Cir. 2005) .............................................................12, 15

Johnson v. District of Columbia,
    528 F.3d 969 (D.C. Cir. 2008) ...............................................................24, 40

K.O. v. U.S. Immigr. & Customs Enf't,
    2020 WL 3429697 (D.D.C. June 23, 2020), *appeal filed* No. 20-5255
    (Aug. 26, 2020) ......................................................................................29

Kenny v. Wilson,
    885 F.3d 280 (4th Cir. 2018) .....................................................................18

Klay v. Panetta,
    758 F.3d 369 (D.C. Cir. 2014) ...................................................................28

Laird v. Tatum,
    408 U.S. 1 (1972)......................................................................................14

Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit,
    507 U.S. 163 (1993)..................................................................................23

*Lederman v. United States.,
    131 F. Supp. 2d 46 (D.D.C. 2001) .............................................................23

*Loumiet v. United States*,
    948 F.3d 376 (D.C. Cir. 2020) .......................................................................22

*MacIsaac v. Town of Poughkeepsie*,
    770 F. Supp. 2d 587 (S.D.N.Y. 2011) ...........................................................18

*\*Mahoney v. Babbitt*,
    105 F.3d 1452 (D.C. Cir. 1997) ...............................................................37, 38

*Mangual v. Rotger-Sabat*,
    317 F.3d 45 (1st Cir. 2003) ...........................................................................15

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ......................................................................................34

*Mejia-Mejia v. ICE*,
    2019 WL 4704150 (D.D.C. Sept. 26, 2019) .................................................29

*Minneci v. Pollard*,
    565 U.S. 118 (2012) ................................................................................20, 30

*\*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012) ........................................................................42

*Norris v. District of Columbia*,
    737 F.2d 1148 (D.C. Cir. 1984) ....................................................................42

*Osborn v. Haley*,
    549 U.S. 225 (2007) ......................................................................................31

*Paton v. La Prade*,
    469 F. Supp. 773 (D.N.J. 1978) ....................................................................25

*\*Patterson v. United States*,
    999 F. Supp. 2d 300 (D.D.C. 2013) ..............................................................23

*Paulin v. George Washington Univ. Sch. of Med. and Health*,
    *Sci.*, 878 F. Supp. 2d 241 (D.D.C. 2012) ....................................11, 12, 13, 35

*Pub. Citizen v. FTC*,
    869 F.2d 1541 (D.C. Cir. 1989) ....................................................................15

*\*Quaker Action Grp. v. Hickel*,
    421 F.2d 1111 (D.C. Cir. 1969) ........................................................26, 27, 42

*Rudder v. Williams*,
    666 F.3d 790 (D.C. Cir. 2012) ................................................................40, 42

*Safford Unified Sch. Dist. No. 1 v. Redding*,
    557 U.S. 364 (2009) ......................................................................................32

*\*Sherrill v. Knight*,
    569 F.2d 124 (D.C. Cir. 1977) ......................................................................26

*Structural Refrom Revisited*,
    95 CAL. L. REV. 1387 (2007) ................................................................................ 18

*Tatum v. Morton*,
    402 F. Supp. 719 (D.D.C. 1974) ............................................................................ 35

*United States v. Doe*,
    968 F.2d 86 (D.C. Cir. 1992) .................................................................. 34, 36, 37

*United States v. Grace*,
    461 U.S. 171 (1983) ................................................................................................ 34

*United States v. Nixon*,
    418 U.S. 683 (1974) ................................................................................................ 29

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ................................................................................................ 35

*Ward v. Utah*,
    321 F.3d 1263 (10th Cir. 2003) ...................................................................... 14, 15

*\*White House Vigil for ERA Committee v. Clark*,
    746 F.2d 1518 (D.C. Cir. 1984) ............................................................................ 36

*Wilke v. Robbins*,
    551 U.S. 537 (2007) ................................................................................................ 31

*Wood v. Moss*,
    572 U.S. 744 (2014) ........................................................................................ 35, 36

*Ybarra v. Illinois*,
    444 U.S. 85 (1979) .................................................................................................. 41

*\*Ziglar v. Abbasi*,
    137 S. Ct. 1843 (2017) ...................................................................................*passim*

**Statutes & Other Authorities:**

FED. R. CIV. P. 8(a)(2) ..................................................................................................... 11

28 U.S.C. § 2679 ............................................................................................................... 31

28 U.S.C. § 2680(a) .......................................................................................................... 31

John   C.   Jeffries,   Jr.   &   George   A.   Rutherglen,   *Structural   Reform   Revisited*,
    95 CAL. L. REV. 1387, 1420 (2007) ..................................................................... 18

Judiciary Act of 1789 § 35, 1 Stat. 73 (1789) ............................................................... 23

### PLAINTIFFS' OMNIBUS MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Defendants, in their individual[1] and official[2] capacities, move to dismiss Plaintiffs'[3] claims stemming from the injuries they sustained in Defendants' violent attack on peaceful protesters in Lafayette Square on June 1, 2020.  For the reasons stated herein, Defendants' Motions must be denied.

## I.      Relevant Factual Background

### A.  The Death of George Floyd

On May 25, 2020, at approximately 8:00 p.m., George Floyd, a 46-year-old black man, was killed by members of the Minneapolis Police Department who had arrested him for allegedly passing a $20 counterfeit bill at a grocery store.  (Compl.[4] ¶ 16).  After handcuffing Mr. Floyd and laying him on the ground, Officer Derek Chauvin then pressed his knee and leaned his body weight into Mr. Floyd's neck.  (Compl. ¶ 16).  Mr. Floyd desperately plead for relief, repeatedly stating "please," "I can't breathe," and calling "Mama."  (Compl. ¶ 16).  Officer Chauvin ignored Mr. Floyd's pleas, and kept his knee pressed into his neck, even after no pulse was detected, for a total of eight minutes and forty-six seconds.  (Compl. ¶ 16).  After responding paramedics found

---

[1]     Defendant Attorney General William P. Barr ("Defendant Barr") moves in his individual capacity. (ECF No. 20).

[2]     Defendants President Donald J. Trump, Defendant Barr, Acting Secretary of Defense Christopher C. Miller, Acting Chief of the U.S. Park Police Gregory T. Monahan, Director of the U.S. Secret Service James M. Murray, Commanding General of the D.C. National Guard Major General William Walker, and Chief of Staff of the United States Army General James C. McConville (collectively, "Official-Capacity Defendants") move in their official capacities.  (ECF No. 19).

[3]     Since the filing of Defendants' Motions, Plaintiff Ryan Roth and Isabella Kavanagh's cases have been consolidated by this Court.  Accordingly, this Opposition is filed on behalf of both Plaintiffs.

[4]     The *Roth* and *Kavanagh* Complaints are largely identical, with the exception of descriptions of each individual Plaintiff's experience and injuries, which are discussed herein.  Unless otherwise indicated, all citations herein to the Complaint refer to the Roth Complaint, ECF No. 1.

him unresponsive and pulseless, Mr. Floyd was ultimately pronounced dead that evening. (Compl. ¶ 16).

Mr. Floyd's killing was perceived by many as the brutal culmination of a series of similar interactions between law enforcement officers and people of color, including the March 13, 2020, killing of Breonna Taylor by Louisville, Kentucky police officers who entered her home in the middle of the night and shot her eight times.  (Compl. ¶ 17).

**B. Peaceful Demonstrations in Lafayette Square: May 29, 2020 – May 31, 2020**

Lafayette Square is a seven-acre public park in Washington, D.C., located on H Street between 15th and 17th Streets, directly across from the White House.[5]  (Compl. ¶ 18). It is the closest public park to the White House.  (Compl. ¶ 18).



*Image captured from Google Maps, June 11, 2020*

---

[5]   National      Park       Service,     *Lafayette     Square      Historic      District*, https://www.nps.gov/nr/travel/wash/dc30.htm   (accessed June 10, 2020).

As a traditional public forum, throughout its history, Lafayette Square has been frequently used by activists exercising their First Amendment Rights.  (Compl. ¶ 19).  From May 29, 2020 through May 31, 2020, peaceful demonstrators gathered daily in Lafayette Square to protest racial injustice, police brutality, and the murders of Mr. Floyd and Ms. Taylor.  (Compl. ¶ 20).  Some knelt in silence; others chanted and held signs emblazoned with "Black Lives Matter" and Mr. Floyd's final words of "I Can't Breathe."  (Compl. ¶ 20).

### C.  Defendants Encourage the Use of Force against Peaceful Protesters

Following the beginning of protests on May 29, then-President Trump began making a series of social media posts on his now-suspended[6] Twitter account encouraging the use of force against demonstrators.  (Compl. ¶ 21).  He repeatedly threatened and advocated for the use of "overwhelming force" against the peaceful protestors, assuring the public "when the looting starts, the shooting starts"[7] and that agents from the United States Secret Service were "waiting for action" and would greet protestors "with the most vicious dogs, and the most ominous weapons."  (Compl. ¶ 21(a-f)).  Importantly, Trump targeted his encouragement of the use of force against Plaintiffs and other protesters, who were protesting racism, police brutality, and the murders of George Floyd and Breonna Taylor.  (Compl. ¶¶ 21(c), 61).  In contrast to his treatment of Plaintiffs and the viewpoint they expressed, Trump affirmatively invited[8] those who shared his

---

6     On January 8, 2021, Twitter permanently suspended Trump's account "due to the risk of further incitement of violence."  *Permanent Suspension of @realDonald Trump*, Twitter, Inc., January 8, 2021, https://blog.twitter.com/en_us/topics/company/2020/suspension.html.

7     The phrase "when the looting starts, the shooting starts" was first used by Miami Police Chief Walter Headley in 1967.  Barbara Sprunt, *The History Behind 'When the Looting Starts, The Shooting Starts'*, NPR, May 29, 2020, https://www.npr.org/2020/05/29/864818368/the-history-behind-when-the-looting-starts-the-shooting-starts.  Headley had a known history of discriminating against the Black community, and he used the phrase in advocating for the use of police force against black people.  (Compl. ¶ 21(a)).

8     On May 30, 2020, at 9:34 a.m., Trump criticized the protesters in Lafayette Square and encouraged his supporters to engage in a counter-demonstration, tweeting[8]: "The professionally managed so-called 'protesters' at the White House had little to do with the memory of George Floyd. They were just there to

personal views to gather and demonstrate at the same time in Lafayette Square.  (Compl. ¶¶ 21(c), 61).

On June 1, Trump led a conference call with the nation's state governors, during which he encouraged them "to get much tougher," "to dominate," "to clamp down very, very strong," and authorized them to "fight back" against protesters.  (Compl. ¶ 22(a-l)).  During that same call, Defendant Barr insisted that law enforcement had to "dominate" and "control" the streets through a "strong presence" and "adequate force."  (Compl. ¶ 23(a-c)).  Secretary of Defense Esper agreed that they needed to "dominate the battle space."  (Compl. ¶ 24).

### D.  The June 1, 2020 Attack on Plaintiff and Other Peaceful Demonstrators in Lafayette Square

On June 1, 2020, peaceful demonstrators gathered in Lafayette Square to protest police brutality and the deaths of George Floyd and Breonna Taylor.  (Compl. ¶ 25).  That afternoon, District of Columbia Mayor Muriel Bowser announced that a curfew would be in effect from 7:00 p.m. on June 1 through 6:00 a.m. on June 2.  (Compl. ¶ 26).  At 6:04 p.m., following the mayor's announcement, the White House notified reporters that Trump would be delivering a briefing at 6:15 p.m. from the Rose Garden.  (Compl. ¶ 28).  At 6:08 p.m., Defendant Barr arrived to Lafayette Square to meet with law enforcement, including the National Guard, U.S. Secret Service, U.S. Park Police, U.S. Army, and the Arlington County Police.  (Compl. ¶ 29).

At 6:10 p.m., Defendnat Barr, while standing behind law enforcement, pointed to St. John's Church.  (Compl. ¶ 30).  Around the same time, White House Deputy Chief of Staff Tony Ornato contacted the Secret Service to inform them of Trump's intention to make an appearance

---

cause trouble. The @SecretService handled them easily. Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"  (Compl. ¶ 21(c)).

at St. John's Church. (Compl. ¶ 30). The Secret Service subsequently requested the assistance of other law enforcement agencies to clear the area in and around Lafayette Square and St. John's Church. (Compl. ¶ 30).

Additional law enforcement officers appeared at Lafayette Square and began to don gas masks and riot gear. (Compl. ¶ 31). At approximately 6:30 p.m., 30 minutes **before** the District-wide curfew went into effect, law enforcement officers from the National Guard, U.S. Secret Service, U.S. Park Police, U.S. Army, and Arlington County Police forcibly rushed Plaintiffs and other peaceful demonstrators, using tear gas, chemical grenades, pepper balls, and rubber bullets to clear the crowd from in and around Lafayette Square and St. John's Church. (Compl. ¶ 33).

At 6:43 p.m., Trump began delivering his remarks from the Rose Garden. (Compl. ¶ 41). At 6:50 p.m., Trump concluded his remarks with the announcement that he was going to pay his respects to a "very, very special place." (Compl. ¶ 42). At 7:01 p.m., Trump began walking from the White House to St. John's Church, through Lafayette Square. (Compl. ¶ 43). At 7:06 p.m., Trump arrived at St. John's Church, and was handed a Bible, which he held (upside down) for photographs. (Compl. ¶ 44). He made a series of brief remarks, and continued to pose for photographs for five minutes. (*Id*). At 7:11 p.m., Trump departed St. John's Church to return to the White House. (Compl. ¶ 45). The U.S. Department of Justice subsequently acknowledged that Defendant Barr had personally ordered that Lafayette Square be cleared of all demonstrators. (Compl. ¶ 46).

### 1. *Plaintiff Ryan Roth's Injuries*

On June 1, Mr. Roth arrived at Lafayette Square at approximately 4:30 p.m. (Compl. ¶ 27). He joined demonstrators at the front of the crowd, closest to the White House. (Compl. ¶ 27). At no time did Mr. Roth engage in or witness any violent, aggressive, or threatening behavior by the demonstrators. (Compl. ¶ 32). Though he was at the front of the crowd, closest to law

enforcement, he did not hear any requests or warnings from law enforcement to clear the area in and around Lafayette Square or St. John's Church at any time.  (Compl. ¶ 34).

At approximately 6:30 p.m., law enforcement rushed Mr. Roth and the other peaceful demonstrators, using tear gas, chemical grenades, pepper balls, and rubber bullets to clear the area through force.  (Compl. ¶ 33).  Mr. Roth watched in fear and horror as fellow demonstrators were hit with rubber bullets as law enforcement pushed the crowd towards 17th Street.  (Compl. ¶ 35). Suddenly, and without any warning, a law enforcement officer deployed a tear gas canister near Mr. Roth.  (Compl. ¶ 36).  Immediately, Mr. Roth felt searing pain in his eyes, and he began coughing and vomiting, collapsing at the intersection of H Street and 17th Street.  (Compl. ¶ 36).

Mr. Roth remained on the ground for several minutes, unable to get up.  (Compl. ¶ 37). Law enforcement commanded that he leave the area, but offered him no assistance.  (Compl. ¶ 37). Eventually, Mr. Roth managed to get up and walk away from Lafayette Square.  (Compl. ¶ 37).

Mr. Roth suffered a host of serious physical injuries, including skin, eye, and throat irritation, as well as numerous bruises and contusions.  (Compl. ¶ 45).  He also suffered severe fright and emotional distress.  (Compl. ¶ 46).  He is discouraged from exercising his constitutional right to peacefully protest in the future because he fears he will again suffer abuse at the hands of law enforcement.  (Compl. ¶ 46; Ex. 1,  Roth Affidavit at ¶ 4)

### 2.   *Plaintiff Isabella Kavanagh's Injuries*

On June 1, Ms. Kavanagh arrived at Lafayette Square and joined the peaceful demonstrators.  (Kavanagh Compl. ¶ 27).  She had been at Lafayette Square the previous day (May 31) to participate in the peaceful protests.  (Kavanagh Compl. ¶ 27).  At no time did Ms. Kavanagh engage in or witness any violent, aggressive, or threatening behavior on behalf of the demonstrators.  (Kavanagh Compl. ¶ 32).  Like Mr. Roth, she also did not hear any warnings or

requests from law enforcement to clear the area in and around Lafayette Square or St. John's Church at any time.  (Kavanagh Compl. at ¶ 34).

At approximately 6:30 p.m., law enforcement forcibly rushed Ms. Kavanagh and the other peaceful demonstrators, using tear gas, chemical grenades, pepper balls, and rubber bullets to clear the area.  (Kavanagh Compl. ¶ 33).  Ms. Kavanagh was pushed back as law enforcement advanced.  (Kavanagh Compl. ¶ 35).  A law enforcement officer, who was donned in riot gear, made eye contact with her and stated, "I don't want to hurt you." (Kavanagh Compl. ¶ 35). Despite this statement, the officer forcibly struck Ms. Kavanagh with his riot shield, knocking her to the ground.  (Kavanagh Compl. ¶ 35).

Ms. Kavanagh got up from the ground and tried to flee.  (Kavanagh Compl. ¶ 36).  As she ran from Lafayette Square, another law enforcement officer shoved her to the ground and violently struck her with a riot stick on her left leg, near her hip.  (Kavanagh Compl. ¶ 36).  Again, she tried to get up to flee; amidst the chaos, her camera was snatched from her and broken. (Kavanagh Compl. ¶ 37).  As she continued to try to flee Lafayette Square, law enforcement officers began to load rubber bullets.  (Kavanagh Compl. ¶ 38).  Two of the law enforcement officers aimed directly at Ms. Kavanagh, paralyzing her with fear.  (Kavanagh Compl. ¶ 38).

While she stood frozen with fear, law enforcement officers threw a chemical grenade at her that exploded between her legs, causing her severe second-degree burns.  (Kavanagh Compl. ¶ 39).  Eventually, Ms. Kavanagh managed to flee Lafayette Square.  (Kavanagh Compl. ¶ 40). She suffered a multitude of physical injuries in the attack, including second-degree burns and scarring therefrom, severe bruising on both legs, skin irritation, and many bruises and contusions. (Kavanagh Compl. ¶ 48).  She also suffered severe fright and emotional distress.  (Kavanagh Compl. ¶ 49).

Despite these serious injuries and the severe fright and emotional distress she experienced, Ms. Kavanagh intends to continue exercising her constitutional rights to peaceful protest—and in fact did on the following day.  (Ex. 2, Kavanagh Affidavit ¶¶ 4-5).  However, Ms. Kavanagh fears she will again suffer injuries at the hands of law enforcement at a future protest.  (Kavanagh Compl. ¶ 49; Ex. 2 ¶ 5).

**E.  Defendants' Response to the June 1 Attack**

On June 2, 2020, at 9:19 a.m., Trump tweeted, "D.C. had no problems last night. Many arrests. Great job done by all. Overwhelming force. Domination. Likewise, Minneapolis was great (thank you President Trump!)."  (Compl. ¶ 48).  On June 2, 2020, U.S. Park Police Chief Monahan issued a statement that law enforcement forcefully cleared Lafayette Square "[t]o curtail violence that was underway," claiming that by "approximately 6:33 p.m. [on June 1], violent protesters on H Street NW began throwing projectiles including bricks, frozen water bottles, and caustic liquids."  (Compl. ¶ 49).  Neither Mr. Roth, who was at the front of the crowd, nor Ms. Kavanah witnessed the throwing of any projectiles—an account that has been consistently corroborated by video footage of the demonstration.  (Compl. ¶ 49; Kavanagh Compl. ¶ 52).

On June 2, 2020, the U.S. Secret Service announced that all access to Lafayette Square would be blocked indefinitely to "ensure public safety," but identified no present or ongoing threat.  (Compl. ¶ 50).  Federal law enforcement officers erected a perimeter along I Street that stretched from its intersection with 15th Street to its intersection with 17th Street, completely blocking public access to Lafayette Square and preventing the exercise of First Amendment rights therein.  (Compl. ¶ 50).  By June 11—a full 10 days after the protest—only some portions of the fence had been removed.  (Compl. ¶ 50).

On June 4, 2020, Defendant Barr defended the clearing of Lafayette Square, claiming that the demonstrators had thrown projectiles, had become "increasingly unruly," and that they had

been asked three times to move back one block. (Compl. ¶ 51).  Again, neither Mr. Roth nor Ms. Kavanagh saw projectiles thrown.  (Compl. ¶ 51; Kavanagh Compl. ¶ 54).  They never heard any warnings or requests to move, either.  (Compl. ¶ 51; Kavanagh Compl. ¶ 54).  Defendant Barr further denied any correlation between the clearing of Lafayette Square and Trump's walk to St. John's Church minutes later, though he acknowledged his knowledge of the President's plan. (Compl. ¶ 51).  Yet within that same statement, Attorney General Barr said, "The president is the head of the executive branch and the chief executive of the nation and should be able to walk across the street to the church of presidents . . . I don't necessarily view that as a political act," suggesting that Lafayette Square was in fact cleared to afford Trump a photo opportunity.  (Compl. ¶ 51).

On June 8, White House Press Secretary Kayleigh McEnany said that there were "no regrets on the part of this White House" in the clearing of Lafayette Square a week prior.  (Compl. ¶ 52).  Ms. McEnany further defended the use of chemical agents to clear the protestors from Lafayette Square.  (Compl. ¶ 52).

On June 11, 2020, at 8:49 a.m., in an apparent reference to the clearing of Lafayette Square, Trump tweeted, "Our great National Guard Troops who took care of the area around the White House could hardly believe how easy it was. 'A walk in the park', one said. The protestors, agitators, anarchists (ANTIFA), and others, were handled VERY easily by the Guard, D.C. police, and S.S. GREAT JOB!"  (Compl. ¶ 53).

### F.  The Nation Responds to the June 1 Attack

On June 2, 2020, Bishop of the Episcopal Diocese of Washington Mariann Edgar Budde, who oversees St. John's Church, condemned the forceful clearing of Lafayette Square with tear gas, and stated that she was given no notice of Trump's plan to visit the Church.  (Compl. ¶ 54). On that same day, Former Under Secretary of Defense James N. Miller resigned from the Defense

Science Board, citing Secretary of Defense Esper's support of the clearing of Lafayette Square as grounds for his resignation.  (Compl. ¶ 55).  In a resignation letter addressed to Defendant Esper, Miller wrote, "When I joined the Board . . . I again swore an oath of office, one familiar to you, that includes the commitment to 'support and defend the Constitution of the United States . . . and to bear true faith and allegiance to the same' . . . You recited that same oath on July 23, 2019, when you were sworn in as Secretary of Defense. On Monday, June 1, 2020, I believe you violated that oath . . . You may not have been able to stop Trump from directing this appalling use of force, but you could have chosen to oppose it. Instead, you visibly supported it."  (Compl. ¶ 55).

On the following day, June 3, former Secretary of Defense James Mattis issued a statement condemning the forceful clearing of Lafayette Square, stating "When I joined the military, some 50 years ago, I swore an oath to support and defend the Constitution. **Never did I dream that troops taking that same oath would be ordered under any circumstance to violate the Constitutional rights of their fellow citizens—much less to provide a bizarre photo op for the elected commander-in-chief, with military leadership standing alongside.** We must reject any thinking of our cities as a 'battlespace' that our uniformed military is called upon to 'dominate' . . . ."  (Compl. ¶ 56 (emphasis added)).

On June 10, 2020, roughly a week after the attack, more than 1,200 former Justice Department staffers signed a letter to Justice Inspector Michael Horowitz, expressing that they were "disturbed" by Attorney General Barr's order to clear Lafayette Square, and requesting that the Justice Department conduct an internal review into the order.  The former staffers wrote, **"Based on what we know now, these actions [the forceful clearing of peaceful demonstrators in Lafayette Square] violated both the First Amendment of the United States Constitution, which protects freedom of speech and the press, and the right to assemble; and the Fourth**

**Amendment, which prohibits unreasonable seizures, to include objectively unreasonable uses of force by law enforcement officers."** (Compl. ¶ 57 (emphasis added)).

## II.   Legal Standard

Pursuant to Rule 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Paulin v. George Washington Univ. Sch. of Med. and Health Sci.*, 878 F. Supp. 2d 241, 245 (D.D.C. 2012) (internal quotations and citation omitted). "[A] court deciding a motion to dismiss must assume all the allegations in the complaint are true (even if doubtful in fact), and must give the plaintiff the benefit of all reasonable inferences derived from the facts alleged." *Id.* at 245-246 (internal quotations, citation, and punctuation omitted).

The Official-Capacity Defendants move to dismiss pursuant to Rule 12(b)(1). (*See generally* Official-Capacity Defs' MTD[9]). "When a party files a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the plaintiff bears the burden of proving by a preponderance of the evidence that the [c]ourt has subject matter jurisdiction." *Harris v. Sebelius*, 932 F. Supp. 2d 150, 151 (D.D.C. 2013) (internal quotations, citations, and punctuation omitted). "A court considering a motion to dismiss for lack of jurisdiction must accept the factual allegations in the complaint as true." *Id.* "When assessing a motion to dismiss under Rule 12(b)(1), a court may consider any undisputed facts in the record, or 'the complaint supplemented

---

[9]   Unless otherwise noted, Plaintiffs' citations to the Official-Capacity Defendants' Motion to Dismiss refer to the one filed in Mr. Roth's case (ECF No. 19), which is virtually identical to that filed in Ms. Kavanagh's case pre-consolidation.

by undisputed facts plus[10] the court's resolution of disputed facts.'" *Id.* (quoting *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

Defendant Barr moves to dismiss pursuant to Rule 12(b)(6).  (*See generally* Def. Barr MTD).  "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face and to 'nudge[] [his or her] claims across the line from conceivable to plausible.'"  *Paulin*, 878 F. Supp. 2d at 245 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "When deciding a 12(b)(6) Motion to Dismiss, a court may consider 'only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the court] may take judicial notice.'"  *Id.* at 246 (quoting *E.E.O.C. v. St. Francis Xavier Parocial Sch.*, 117 F. 3d 621, 624 (D.C. Cir. 1997)).  "It is essential to remember that, for the purposes of ruling on a motion to dismiss, the factual allegations of the complaint **must** be presumed to be true and liberally construed in favor of the [p]laintiff."  *Id.* (emphasis in original).

## III.  Argument

Notably absent from Defendants' dozens of pages of motions is any acknowledgement of the brutality and blatant unconstitutionality of the harm inflicted on Plaintiffs on June 1, 2020. Plaintiffs were peacefully protesting in Lafayette Square—disobeying no orders or laws.  Without any warning or request to disperse, Defendants advanced on them with violent fervor, using tear gas, rubber bullets, and riot sticks to clear every inch of Lafayette Square.  Why?  Even taking the official explanation at face value, assuming for purposes of argument that violence against peaceful protesters was collateral damage and not the objective, the sole purpose was to afford

---

[10]   Notably, "the district court may consider materials outside of the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction . . . ."  *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

Trump the opportunity to pose for photographs with an upside-down bible—a motivation wholly unrelated to any legitimate government interest.

Granting Defendants' Motions to Dismiss would amount to an endorsement of unwarned and violent law enforcement actions against peaceful protestors.  More specifically, it would rubber-stamp attacks on non-threatening civilians to allow politicians  to visit any destination on a whim.  Defendants committed flagrant constitutional violations for which they must be held accountable.  For the reasons set forth below, Defendants' attempts to undermine Plaintiffs' claims fail, and their Motions should be denied.

### A. The Official-Capacity Defendants' Motion to Dismiss should be denied because Plaintiffs have standing to bring their claims.

The Official-Capacity Defendants challenge Plaintiffs' standing to seek injunctive relief for the violations of their First and Fourth Amendment Constitutional rights.  (*See generally* Official-Capacity Def. MTD).  To establish standing, a plaintiff must "present an injury that is concrete, particularized, and actual or imminent; fairly traceable to the defendant's challenged behavior; and likely to be redressed by a favorable ruling."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019) (internal quotations and citation omitted).  The plaintiff must show that he or she is "suffering an ongoing injury[11] or faces an immediate threat of injury."  *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011)  Generally speaking, surviving a challenge to standing requires that the complaint "contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (internal

---

[11]   An ongoing injury exists when a plaintiff's "past exposure to illegal conduct" is "[]accompanied by . . . continuing, present adverse effects."  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (internal quotations and citation omitted).

quotations, citations, and punctuation omitted).  Plaintiffs have met their burden, and the Official-Capacity Defendants' Motion should be denied.

### 1.    *Plaintiffs have alleged an ongoing injury sufficient to confer standing.*

As detailed above (*supra* Sec. I(D)(1-2)), Plaintiffs have alleged ongoing injuries—physical, emotional, and constitutional—that stem directly from the Official-Capacity Defendants' actions and are sufficient to confer standing.  When the government inflicts harm on a plaintiff—as the Official-Capacity Defendants did here—and when the plaintiff in turn suffers "continuing, present adverse effects in the form of the chilling[12] of his First Amendment rights," the plaintiff has standing to seek injunctive relief.  *Ward v. Utah*, 321 F.3d 1263, 1269 (10th Cir. 2003) (internal quotations and citation omitted).  Put differently, "a First Amendment Plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the . . . **chilling effect** on his desire to exercise his First Amendment rights." *Id.* at 1267 (internal quotations and citation omitted) (emphasis in original); *see also Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020) (conferring standing where "[p]laintiffs allege[d] that the Federal Defendants' crowd-control measures have 'chilled' the exercise of their First Amendment rights, and that this First Amendment injury is ongoing"); *Mangual v. Rotger-Sabat*, 317 F.3d 45, 57 (1st Cir. 2003) (recognizing an injury when a plaintiff "is chilled from exercising her right to free expression or foregoes expression in order to avoid enforcement consequences" (internal quotations and citation omitted)).

---

[12]    The Official-Capacity Defendants cite to *Laird v. Tatum*, 408 U.S. 1 (1972) to allege that Plaintiffs suffered no chilling effects sufficient to confer standing.  (Official-Capacity Defs' MTD at 15).  *Laird* has no bearing on the facts of Plaintiffs' case; there, the plaintiff had not sustained any direct injury.  *Laird*, 408 U.S. at 12-13.  The D.C. Circuit has held that *Laird* does not bar standing where, as here, plaintiffs claim a chilling effect due to "specific action taken against them." *Clark v. Library of Cong,*, 750 F.2d 89, 93 (D.C. Cir. 1984).  Plaintiffs have alleged exactly this injury—that the Official-Capacity Defendants violently targeted them and their viewpoints, inflicting physical and emotional injuries that have left them fearful of protesting again.  (Compl. ¶¶ 46, 58-65; Kavanagh Compl. ¶¶ 61-68 Ex. 1 at ¶ 4; Ex. 2 at ¶ 5).

Here, despite the physical and emotional trauma inflicted upon her by the Official-Capacity Defendants, Ms. Kavanagh has continued[13] to peacefully protest police brutality, returning to Lafayette Square the next day.  (Ex. 2[14] at ¶ 4).  Should the circumstances require it, both Mr. Roth and Ms. Kavanagh intend to engage in future demonstrations like the one they attended in Lafayette Square, but they live in constant fear that the physical and emotional harms the Official-Capacity Defendants inflicted upon them on June 1, 2020 will be repeated.  (Ex. 1 at ¶ 4; Ex. 2 at ¶ 5).  The violent actions undertaken by the Official-Capacity Defendants to clear Lafayette Square on June 1 were intended to—and did—chill Plaintiffs' First Amendment Rights, causing them to suffer an ongoing injury sufficient to confer standing.

### 2. Additionally, Plaintiffs face substantial risk of future injury because of the Official-Capacity Defendants' demonstrated commitment to "dominating" protesters like Plaintiffs.

At the outset, it bears noting that the Official-Capacity Defendants misstate the law in asserting that to establish standing, Plaintiffs must allege an "immediate" threat of future injury. (Official-Capacity Defs' MTD at 8).  The Supreme Court's most recent jurisprudence on this topic has made clear that an allegation of future injury—such as the ones advanced by Plaintiffs—"may suffice if the threatened injury is certainly impending, **or there is substantial risk that the harm will occur.**"  *Dep't of Commerce*, 139 S. Ct. at 2565 (internal quotations and citation omitted) (emphasis added).  Indeed, the D.C. Circuit has specifically and repeatedly held that allegations

---

[13]   Ms. Kavanagh's persistence in attempting to exercise her First Amendment rights despite the harms inflicted upon her does not doom her claims.  Any argument to the contrary would "fall[] into the familiar trap of confusing the merits of a case with the threshold requirement of standing to present a challenge." *Pub. Citizen v. FTC*, 869 F.2d 1541, 1549 (D.C. Cir. 1989).

[14]   In deciding a Rule 12(b)(1) Motion to Dismiss, the Court is permitted to consider matters outside of Plaintiffs' Complaints.  *Jerome Stevens Pharm., Inc.*, 402 F.3d at 1253.  Pending the outcome of the Official-Capacity Defendants' Motion to Dismiss, Plaintiffs will move to amend the Complaint to include their intent to continue engaging in future peaceful protests, as reflected in their respective Affidavits.

of "substantial risk"[15] are sufficient to establish standing.  *See Attias v. Carefirst, Inc.*, 865 F.3d 620, 626-27 (D.C. Cir. 2017) (citing examples); *see also In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016) (using "substantial risk" and "reasonabl[e] fears" as the standard).

The risk of another attack similar in nature to the one advanced on Plaintiffs in Lafayette Square is substantial.  Defendants have time and again made clear their intention and ability to use "overwhelming force" to "dominate" peaceful protesters like Plaintiffs.  (*See supra* Sec. I(C)). On his Twitter account—which has since then been permanently suspended due to the perceived likelihood of inciting further violence amongst his followers—Trump threatened and advocated for the use of "overwhelming force" against the peaceful protestors, assuring the public "when the looting starts, the shooting starts" (a phrase which was historically used to advocate for the use of police force against black people), and that agents from the United States Secret Service were "waiting for action" and would greet protestors "with the most vicious dogs, and the most ominous weapons."  (Compl. ¶ 21(a-f)).

Then, on June 1, just hours before the attack, Trump led a conference call with the nation's state governors, during which he encouraged them "to get much tougher," "to dominate," "to clamp down very, very strong," and authorized them to "fight back" against protesters.  (Compl. ¶ 22(a-l)).  During that same call, Defendant Barr insisted that law enforcement had to "dominate" and "control" the streets through a "strong presence" and "adequate force."  (Compl. ¶ 23(a-c)). Secretary of Defense Esper in turn agreed that they needed to "dominate the battle space." (Compl. ¶ 24).

---

[15]   In addition to recognizing standing based on a substantial risk of future harm, the D.C. Circuit has conferred standing when a plaintiff suffers an ongoing harm accompanied by an objective chill of constitutional rights.  *Clark*, 750 F.2d at 93.  An ongoing injury exists when a plaintiff's "past exposure to illegal conduct" is "[]accompanied by . . . continuing, present adverse effects."  *Lyons*, 461 U.S. at 102 (1983) (internal quotations and citation omitted).

These statements come from the mouths of government officials who have every resource available to carry out their stated threats and intentions.  At no time did the Official-Capacity Defendants imply that the use of force against protestors—like that deployed in Lafayette Square—was an isolated incident.  Rather, the Official-Capacity Defendants' words reflect their clear intent to continue violating the constitutional rights of Plaintiffs and other peaceful protestors.

> ### *3.      The substantial risk of harm to Plaintiffs is not speculative.*

The Official-Capacity Defendants point to *Lyons* to argue that Plaintiffs' risk of future harm is "speculative" and depends on the recurrence of an (allegedly) "unlikely sequence of events."  (Official-Capacity Defendants' MTD at 11-12).  In *Lyons*, the plaintiff was stopped by police officers for a traffic violation, and though he posed no cognizable threat, was placed in a chokehold.  *Lyons*, 461 U.S. at 97.  The plaintiff sought an injunction against the police department's use of chokeholds.  *Id.* at 98.  While he was awarded a preliminary injunction by the district court, the Supreme Court ultimately reversed, finding the plaintiff did not have standing because it was speculative that he would experience another injury of the same type.  *Id.* at 95.

In this holding, the Supreme Court reasoned that "it is surely no more than speculation to assert either that Lyons himself . . . will be arrested in the future and provoke the use of a chokehold by resisting arrest, attempting to escape, or threatening deadly force or serious bodily injury."  *Id.* at 108.  Among the Court's reasons for finding that the plaintiff's injury was speculative was the notable absence of direction from the City of Los Angeles that police officers should use unwarranted force and employ chokeholds on individuals who otherwise do not pose a threat.  *Id.* at 110.

*Lyons* is inapposite for three reasons.  First, unlike the *Lyons* plaintiff who was **legally** stopped by police for a traffic violation, Plaintiffs were **illegally** attacked by the Official-Capacity

Defendants while Plaintiffs were peacefully (and lawfully) protesting.  Numerous courts have declined to apply *Lyons* when—as here—a plaintiff is subjected to illegal state action for engaging in lawful conduct.  *See Kenny v. Wilson*, 885 F.3d 280, 289-90 (4th Cir. 2018) (declining to apply *Lyons* to allegations of a chilling effect on constitutional rights); *Hernandez v. Cremer*, 913 F.2d 230, 234 (5th Cir. 1990) ("Hernandez (unlike Lyons) was engaged in an activity protected by the Constitution."); *see also MacIsaac v. Town of Poughkeepsie*, 770 F. Supp. 2d 587, 601 (S.D.N.Y. 2011) (noting that *Lyons* applies in cases where a plaintiff "willfully br[oke] the law"); John C. Jeffries, Jr. & George A. Rutherglen, *Structural Refrom Revisited*, 95 CAL. L. REV. 1387, 1420 (2007) ("*Lyons* poses no insurmountable barrier.  The lower courts have limited *Lyons* to cases in which the plaintiff's own misconduct led to the disputed police action.").

Second, unlike the *Lyons* plaintiff, Plaintiffs **have** alleged that the Official-Capacity Defendants not only authorized but encouraged the use of force against them in Lafayette Square. (Compl. ¶¶ 21-24).  On multiple occasions, the Official-Capacity Defendants stressed the need to use "overwhelming force" to "dominate" over protesters, including the use of "vicious dogs" and "ominous weapons" that could leave people "really badly hurt, at least."  (Compl. ¶¶ 21-24).

Third[16], the substantial risk that Plaintiffs will suffer harm again is not based upon the unlikely sequence of events (i.e. an arrest for unlawful conduct and a subsequent unwarranted chokehold) that proved detrimental to the *Lyons* plaintiff.  The only relevant question is whether Defendants will once again use force and violence to disperse peaceful protesters—a scenario far

---

[16]   It further bears noting that *Lyons* was decided based on a review of "[t]he record and findings" that had been collected throughout the litigation.  *Lyons*, 461 U.S. at 110.  Here, the record has not yet been developed.  The Official-Capacity Defendants rely heavily on *Chang v. United States*, 738 F. Supp. 2d 83 (D.D.C. 2010) but neglect to mention that the case was decided on a motion for partial summary judgment, after the court had reviewed "the entire record."  *Chang*, 738 F. Supp. 2d at 84; (Official-Capacity Defs' MTD at 14).  When the government moved to dismiss in *Chang* at the pleading stage for lack of standing, the court denied its motion.  *Chang v. United States*, 2007 WL 2007335 at *6 (D.D.C. July 10, 2007).

simpler than the seven-pronged sequence the Official-Capacity Defendants set forth.  (Offical-Capacity Defs' MTD at 11-12).  Given the Official-Capacity Defendants' repeated encouragement of the use of force against all protesters (regardless of whether they were engaged in lawful activity), this scenario is all too probable and the risk of harm all too substantial.

    **B.  Defendant Barr's Motion to Dismiss his individual-capacity claims should be denied because Plaintiffs do not seek a new damages remedy, and Defendant Barr is not entitled to qualified immunity.**

    Pursuant to *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), Plaintiffs seek redress against Defendant Barr in his individual capacity for the outward violations of their First and Fourth Amendment rights.  Though the Supreme Court and the D.C. Circuit have authorized claims in these contexts (*Bivens*, 403 U.S. at 397-98 (Fourth Amendment); *Dellums v. Powell*, 566 F.2d 167, 194 (D.C. Cir. 1977) (First Amendment)), Defendant Barr alleges that Plaintiffs' claims present a "new context" that subject them to the Supreme Court's "special factors" analysis to judge their viability.  (Def. Barr MTD[17] at 4-12).

    Defendant Barr then asserts that he is entitled to qualified immunity, alleging that he was not personally involved in the attacks on Plaintiffs and that forcibly clearing them from Lafayette Square did not violate their First and Fourth Amendment rights.  (Def. Barr MTD at 27-36).  Because Plaintiffs do not allege any new claims and Defendant Barr is not entitled to qualified immunity, Defendant Barr's Motion should be denied.

    *1.  Plaintiffs do not seek a new damages remedy.*

    *Bivens* marked the first time the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).  The Court's reasoning for authorizing such

---

[17]    The motions filed by Defendant Barr in Mr. Roth and Ms. Kavanagh's cases pre-consolidation are identical.

actions was straightforward: "[W]here federally protected rights have been invaded, courts will adjust their remedies so as to grant the necessary relief." *Minneci v. Pollard*, 565 U.S. 118, 123 (2012). The purpose of a *Bivens* remedy is twofold: (1) deterrence from the commission of constitutional violations and (2) compensation to victims of such violations. *See id.* at 127 (2012); *see also Carlson v. Green*, 446 U.S. 14, 21 (1980) ("It is almost axiomatic that the threat of damages has a deterrent effect, surely particularly so when the individual official faces personal financial liability." (citation omitted)). Indeed, a *Bivens* remedy is the **only option** for victims who do not have other avenues of recourse against federal officials for constitutional violations. *See Bivens*, 403 U.S. at 409-10 (Harlan, J., concurring); *see also Carlson*, 446 U.S. at 21.

The Supreme Court has articulated a two-step analysis to determine whether a *Bivens* action may lie. *Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017). First, the court must determine if the case "presents a new *Bivens* context," which depends on whether the case "differ[s] in a meaningful way" from previous Supreme Court cases recognizing the availability of a *Bivens* action. *Id.* at 1859-1860. Meaningful differences can exist among: (1) "the rank of the officers involved;" (2) "the constitutional right at issue;" (3) "the generality or specificity of the official action;" (4) "the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted;" (5) "the statutory or other legal mandate under which the officer was operating;" (6) "the risk of disruptive intrusion by the Judiciary into the functioning of other branches;" or (7) "the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 1860.

Second, if the context is new, then the court must decide if "special factors" weigh against recognizing a right of action. *Id*. The Supreme Court has never defined what constitutes a "special factor," but has explained that the inquiry questions whether courts are "well suited,

absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1857-58. A "special factor" is one that "cause[s] a court to hesitate before answering that question in the affirmative." *Id.* at 1858.

Applying this two-step analysis to this case, it is clear that Plaintiffs may proceed with their *Bivens* actions against Defendant Barr. First, Plaintiffs' claims do not present a new *Bivens* context. Second, even if they did, no special factors exist to weigh against holding Defendant Barr accountable for his violations of Plaintiffs' constitutional rights.

### a) *Bivens* remedies are available for the violations of Plaintiffs' First and Fourth Amendment rights.

Plaintiffs' claims arising from the violations of their First and Fourth Amendment rights do not present a new *Bivens* context. Even Defendant Barr does not dispute that *Bivens* itself involved a Fourth Amendment violation. *Bivens*, 403 U.S. at 397-98; (Def. Barr MTD at 8-9). And it is well established in both the D.C. Circuit and this Court that a *Bivens* remedy is available for First Amendment violations. *Dellums*, 566 F.2d at 194; *see also Bloem v. Unknown Dep't of Interior Emps.*, 920 F. Supp. 2d 154, 159 (D.D.C. 2013) ("Both this Circuit and this Court itself have held that a *Bivens* action may lie for violations of the First Amendment rights of demonstrators.").

This Court need look no further than *Dellums*, which held that a *Bivens* remedy was available to Vietnam War protesters who were arrested on the steps of the Capitol and subsequently filed suit for violations of their First Amendment rights (among others). *Dellums*, 566 F.2d at 195 ("The demonstration, the picket line, and the myriad other forms of protest which abound in our society each offer peculiarly important opportunities in which speakers may at once persuade, accuse, and seek sympathy or political support, all in a manner likely to be noticed. Loss of such an opportunity is surely not insignificant."); *see also Hartley v. Wilfert*, 918 F. Supp.

2d 45, 50 (D.D.C. 2013) ("In *Dellums*, this Circuit held that a *Bivens*-style damages action was maintainable where demonstrators protesting the war in Vietnam were arrested in the steps of the United States Capitol in violation of their First Amendment rights."). The D.C. Circuit has not revisited[18] its decision in *Dellums*, nor should this Court take up that charge. *See Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc); *Hartley*, 918 F. Supp. 2d at 52 (same). Indeed, in the years since *Dellums* was decided, the D.C. Circuit and courts in this district have repeatedly authorized *Bivens* remedies in First Amendment cases. *Hobson v. Wilson*, 737 F.2d 1, 56, 62-63 (D.C. Cir. 1984) (upholding *Bivens* claims against FBI agents involved in impeding anti-war and pro-civil rights protests in violation of the First Amendment), *partially abrogated on other grounds*, *Leatherman v. Tarrant Cty. Narcotics Intel. & Coord. Unit*, 507 U.S. 163 (1993); *Patterson v. United States*, 999 F. Supp. 2d 300, 303, 308-11, 317 (D.D.C. 2013) (recognizing *Bivens* claim for violations of the First and Fourth Amendments where officers arrested a plaintiff for using profanity in a public park); *Lederman v. United States.*, 131 F. Supp. 2d 46, 57, 62-63 (D.D.C. 2001) (allowing *Bivens* claim for Capitol Police officer's arrest of demonstrator in violation of the First and Fourth Amendments).

Bivens claims have been allowed in the Fourth Amendment context, too. While conceding that *Bivens* itself was a Fourth Amendment case, Defendant Barr argues that Plaintiffs' claims are so factually different from those in *Bivens* as to present a new context. (Def. Barr MTD at 8-9). Defendant's characterization of the jurisprudence on this topic does not comport with reality; *Bloem* specifically recognized that a *Bivens* remedy is available to protesters for violations of

---

[18]   *Loumiet v. United States*, 948 F.3d. 376 (D.C. Cir. 2020), does not, as Defendant Barr suggests, condemn Plaintiffs' First Amendment claims. (Def. Barr MTD at 8). While *Loumiet* involved a First Amendment claim, the plaintiff sought damages for retaliatory actions pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act—which has its own administrative enforcement scheme and specified availability for judicial review. *Loumiet*, 948 F.3d at 384-85.

their Fourth Amendment rights.  *Bloem*, 920 F. Supp. 2d at 161 ("Wisely, Defendants do not appear to dispute that a *Bivens* action may lie for Plaintiff's Fourth and Fifth Amendment claims. Indeed, the availability of such a remedy is well established.").

### b)  Defendant Barr is not a new category of defendant.

Next, Defendant Barr asserts that he is a new category of defendant against whom a *Bivens* claim cannot be raised.  (Def. Barr MTD at 9).  Again, Defendant Barr is wrong.  The Supreme Court has long authorized *Bivens* remedies against high-ranking officials like Defendant Barr on the basis that their individual actions violated constitutional rights.  *Davis v. Passman*, 442 U.S. 228, 248-49 (1979) (Congressman); *Carlson*, 446 U.S. at 18-19 (Director of the Bureau of Prisons).  Notably, Defendant Barr (on June 1, 2020) shared the same[19] rank as the Director of the Bureau of Prisons in *Carlson*, and was of a lower[20] rank than the Congressman in *Davis*.

### c)  The extent of judicial guidance is no different than that in *Bivens*.

Defendant Barr next argues that the extent of judicial guidance regarding how the Executive Branch should have acted to clear the protesters in Lafayette Square was "markedly different" than in *Bivens*.  (Def. Barr MTD at 9).  Not so.  The question is not, as Defendant contends, (Def. Barr MTD at 10), whether guidance exists regarding whether the Attorney General can disperse protesters at a time of (alleged) unrest.  Rather, the question is how and when a seizure may be effected in accordance with the Constitution.  As set forth below (*see infra* Sec. III(c)), at the time of the June 1 attack, there was an overwhelming plethora of case law stating that a seizure must be reasonable—*i.e.* that a law enforcement officer "must have some

---

[19]    Both the Attorney General and the Director of the Bureau of Prisons are directors of federal agencies supervised by members of the President's Cabinet.

[20]    Congressional representatives are constitutional offices, whereas the Attorney General's office is a creature of statute.  *See* Judiciary Act of 1789 § 35, 1 Stat. 73 (1789).

justification for the quantum of force he uses." *Johnson v. District of Columbia*, 528 F.3d 969, 977 (D.C. Cir. 2008).

> ### d) Allowing a *Bivens* remedy for Plaintiffs' claims would not disrupt the functioning of the Executive Branch.

Lastly, Defendant Barr argues that Plaintiffs' lawsuit risks disrupting the Executive Branch through judicial intrusion. (Def. Barr MTD at 10). Without any supporting authority or example, Defendant Barr leaves Plaintiffs and the Court guessing as to how such intrusion could occur. The best Defendant Barr offers is that the risk of personal liability could raise amorphous "national security" concerns. (Def. Barr MTD at 10). The mere suggestion of unidentified concerns cannot suffice to meet Defendant Barr's burden.

Plaintiffs' claims have nothing to do with the security of the President, the White House, or the nation. Rather, despite their importance, Plaintiffs' claims are decidedly more mundane— clear violations of the First and Fourth Amendments stemming from the violent dispersal of their peaceful protest in a public forum. As discussed in detail below (*see infra* Sec. III(B)(2)(a)), Defendant Barr's cries of "national security" ring hollow and find no basis in the facts of this case.

> ### 2. *No special factors are present to question the availability of a Bivens remedy.*

Alternatively, even if Plaintiffs did seek a new *Bivens* remedy (and they do not), no "special factors" exist that would hinder the availability of a *Bivens* remedy in this context. *See Abbasi*, 137 S. Ct. at 1858. Defendant Barr alleges the existence of four "special factors," none of which are implicated by this action.

> ### a) Plaintiffs' claims do not raise national security concerns.

First, Defendant Barr alleges that Plaintiffs' claims implicate national security interests that are reserved for the judgment of Congress and the President, and cannot be remedied with a

*Bivens* lawsuit. (Def. Barr MTD at 12). Despite devoting numerous pages to this argument, Defendant Barr never once answers the question of **why** national security interests (if they were implicated) required a militarized attack on peaceful protesters, complete with tear gas, chemical grenades, and rubber bullets.

"National security" is not an amorphous shield against all claims; as the Supreme Court warned in *Abbasi*, "national-security concerns must not become a talisman used to ward off inconvenient claims—a label used to cover a multitude of sins." *Abbasi*, 137 S. Ct. at 1862 (internal quotations and citation omitted); *see also Paton v. La Prade*, 469 F. Supp. 773, 781 (D.N.J. 1978) (dispelling the "myth that national security is an incantation with which the government can circumvent the Constitution or the laws of the land"). Even cases involving the exercise of First Amendment rights **inside** the White House (as opposed to in its general vicinity) have not permitted the vague cries of "national security" to justify the infringement of constitutional rights. *See Sherrill v. Knight*, 569 F.2d 124, 130 (D.C. Cir. 1977) (White House was required to justify rejecting press pass applicants for "reasons of security" because the phrase was "unnecessarily vague and subject to ambiguous interpretation.").

The only national security concern Defendant Barr articulates is the safety of Trump—an interest that is not at home inside the four corners of Plaintiffs' Complaints. (Def. Barr MTD at 14-15). Plaintiffs do not dispute that protecting the safety of the President is a national security interest—it is, but that interest has no bearing on the facts of this case. To be sure, Plaintiffs' claims challenge the direct and substantial involvement of Defendant Barr in ordering the forcible dispersion of peaceful protestors in Lafayette Square to afford Trump a chance to pose for photographs at St. John's Church. The trip served no legitimate government interests and bore no relation to Trump's official duties. Photo opportunities are not matters of national security,

and they certainly do not entitle Defendant Barr to order the deployment of tear gas, rubber bullets, and militarized law enforcement officers as a means to forcibly remove peaceful protesters—who posed no cognizable threat—from a public forum.

As the D.C. Circuit has held, "[w]hile courts must listen with the utmost respect to the conclusions of those entrusted with responsibility for safeguarding the President, **we must also assure ourselves that those conclusions rest upon solid facts and a realistic appraisal of the danger rather than vague fears extrapolated beyond any foreseeable threat."** *Quaker Action Grp. v. Hickel*, 421 F.2d 1111, 1117 (D.C. Cir. 1969) (emphasis added). *Hickel* involved a challenge to regulations governing the conduct of demonstrators in front of the White House and in Lafayette Square. *Id*. at 1112. There, the D.C. Circuit held that the district court had not abused its discretion in granting a preliminary injunction against enforcement of the regulations. *Id*. at 1117. While the court ultimately modified the injunction to ensure the President's safety, it disagreed with the government's assertion that "mere mention of the President's safety must be allowed to trump any First Amendment issue," and noted that "there is a wide gulf between disorderliness on Pennsylvania Avenue and a storming of the White House over a tall, pointed steel fence across 230 feet of lawn." *Id*. at 1117-118. The court further emphasized that **"the Government must in fact show such a danger rather than simply advance its conclusion as a determination binding upon the courts."** *Id*. at 1118 (emphasis added).

Even if Trump's trip to St. John's invoked national security concerns, Defendant Barr makes no showing that the crowd of peaceful protesters posed any danger, or that the violence Defendants employed to clear Lafayette Square was in any way warranted. Instead, Defendant Barr asserts that because protests occurring on different days elsewhere in the District of Columbia had progressed to "looting, rioting, and vandalism," Trump's arrival at Lafayette

- 26 -

Square posed a "heightened the possible danger to the President."  (Def. Bar MTD at 33).  That protests elsewhere in the District of Columbia prior to June 1, 2020 had resulted in unrest has no bearing on whether Plaintiffs posed any cognizable threat to the Trump's safety.  Indeed, Defendant Barr cannot point to one shred of evidence that Mr. Roth or Ms. Kavanagh were anything but peaceful, let alone had any intentions of harming Trump.  (They did not.)

Defendant Barr's far-fetched suggestion that national security concerns would have existed even if Trump had remained in the White House rather than walking to St. John's Church further undermines the viability of his argument.  (Def. Barr MTD at 14).  If the law were as Defendant Barr imagines, every peaceful demonstrator protesting in a public space in the general proximity of the White House would be subject to tear gas, rubber bullets, and riot sticks without warning.  The President could demand to go anywhere, at any time, for any reason—legitimate or otherwise—and law enforcement would be entitled to clear the vicinity of innocent civilians using violence and force.  That cannot be the law.  It is not.

Defendant Barr has no grounds for invoking national security concerns, and a *Bivens* remedy is available to Plaintiffs.

### b)  Congress has not legislated extensively in the relevant field of protestor rights and remedies.

Second, Defendant Barr embarks on a historical tour of legislation relating to presidential assassinations to argue that because Congress has (allegedly) legislated extensively in the field of presidential security, this Court should decline to recognize a *Bivens* remedy for Plaintiffs' claims.  (Def. Barr MTD at 15-19).  At risk of stating the obvious, this case is not about presidential assassinations.

In determining whether Congress has legislated extensively in a field, courts focus on the "particular topic" relating to plaintiffs' claims.  *See Klay v. Panetta*, 758 F.3d 369, 376 (D.C. Cir.

- 27 -

2014).  Here, Plaintiffs' claims center on protesters' constitutional rights and remedies—not presidential assassination or national security.  Neither the Congressional hearings nor the legislation cited by Defendant Barr comes anywhere close to addressing protestors' rights and remedies; instead, they address topics like the function of the Secret Service, criminalizing threats to the President, and fence-jumping at the White House.  (Def. Barr MTD at 15-19).  Defendant Barr cannot fit these square pegs into a round hole to allege that Congress has legislated extensively in the field of protestor rights and remedies.

### c)  Plaintiffs' claims do not pose administrability concerns.

Third, Defendant Barr contends that this case requires discovery into his deliberations and decision-making process, and that the burdens and demand of litigation would infringe upon the discharge of his duties.  (Def. Barr MTD at 21-24).  Neither argument is availing.

The Supreme Court has held that *Bivens* claims against high-ranking officials are inappropriate if they "would call into question the formulation and implementation of a general policy" that would in turn lead to intrusive discovery "border[ing] upon or directly implicat[ing] the discussion and deliberations that led to the formation of the policy in question."  *Abbasi*, 137 S. Ct. at 1860-61.  Neither concern applies.  First, Plaintiffs do not allege that the government had a policy[21] of attacking peaceful protesters—rather, they allege that a discrete order was given to forcibly clear Lafayette Square at a single moment on June 1, 2020.  Second, the Supreme Court has rejected the notion that conversations between the President and his aides must always be shielded from discovery.  *See United States v. Nixon*, 418 U.S. 683, 703-13 (1974).

---

[21]   The cases Defendant Barr cites regarding the dismissal of *Bivens* claims against Attorney Generals are easily distinguishable; both involved challenges to government policies, not isolated actions taken on a specific day.  (Def. Barr MTD at 23); *See Mejia-Mejia v. ICE*, 2019 WL 4704150 at *4-5 (D.D.C. Sept. 26, 2019); *see also K.O. v. U.S. Immigr. & Customs Enf't*, 2020 WL 3429697 (D.D.C. June 23, 2020), *appeal filed*, No. 20-5255 (Aug. 26, 2020).

Defendant Barr's argument about the demands of litigation fares no better.  If every *Bivens* defendant were allowed to escape liability on these grounds, the core purpose of *Bivens* remedies—to deter constitutional violations—would be severely undercut.  In addition, the Supreme Court has noted both that discovery can be directed at a sitting President (an official superior in rank to Defendant Barr) and that he can be subjected to a civil trial.  *Clinton v. Jones*, 520 U.S. 681, 705 (1997).  Even if the alleged burden of litigation were a viable concern, it could best be resolved through limitations on discovery, not a wholesale dismissal of Plaintiffs' claims.

### d)  No alternative forms of relief provide redress for Plaintiffs' injuries.

Fourth, Defendants allege that Plaintiffs have alternative forms of relief available to them that preclude a *Bivens* remedy, including prospective injunctive relief, state law tort claims, and claims under the Federal Tort Claims Act ("FTCA").  (Def. Barr MTD at 24-26).  None of the alternative options Defendant proposes are feasible.

### i.  *Prospective injunctive relief does not remedy the harm Plaintiffs already suffered.*

Defendant Barr cites *Abbasi* for the proposition that that because Plaintiffs are pursuing prospective injunctive relief, a *Bivens* remedy is not available.  (Def. Barr MTD at 24).  *Abassi* does not stand for this proposition; there, the Supreme Court recognized that in contrast to challenges to "large-scale" government policies, "challenge[s] to individual instances of discrimination or law enforcement overreach" are "difficult to address except by way of damages actions after the fact."  137 S. Ct. at 1862.  It bears repeating that Plaintiffs are not challenging a government policy; instead, they seek redress for Defendant Barr's direct and personal involvement in the forceful clearing of Lafayette Square that left Plaintiffs with a constellation of physical and emotional injuries.

Any alternative remedy must "provide roughly similar incentives for potential defendants to comply with the [Constitution] while also providing roughly similar compensation to victims of violations." *Minneci v. Pollard*, 565 U.S. 118, 130 (2012). Simply put, the prospective injunctive relief Plaintiffs seek does nothing to redress their past harms; it is a forward-facing remedy. *Aref v. Lynch*, 833 F.3d 242, 265 n. 17 (D.C. Cir. 2016) ("Injunctive relief . . . cannot provide relief for past harms."); *Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 328 (D.C. Cir. 2004) (same); *accord Abbasi*, 137 S. Ct. at 1879 (Breyer, J., dissenting) ("Neither a prospective injunction nor a writ of habeas corpus, however, will normally provide plaintiffs with redress for harms they have **already** suffered." (emphasis in original)). And Plaintiffs' invocation of injunctive relief cannot weigh against a *Bivens* remedy where the Official-Capacity Defendants (including Defendant Barr) argue that Plaintiffs lack standing to seek injunctive relief. (*See supra* Sec. III(A)).

### ii.    State tort law and the FTCA will not redress Plaintiffs' injuries.

Neither state law tort claims nor the FTCA are viable alternatives. In advocating for the availability of a state law tort remedy, Defendant Barr neglects to recognize that the Westfall Act preempts state law tort claims against federal officers (like Defendant Barr) acting within the scope of their employment. *See* 28 U.S.C. § 2679; *Jacobs v. Vrobel*, 724 F.3d 217, 220 (D.C. Cir. 2013) ("As the Supreme Court has explained, 'the purpose of the Westfall Act [is] to shield covered employees not only from liability but from suit.'") (quoting *Osborn v. Haley*, 549 U.S. 225, 248 (2007)).

The FTCA is no better an option. First, the Supreme Court has repeatedly held that an FTCA claim is not "a substitute for a *Bivens* action." *Bush v. Lucas*, 462 U.S. 367, 378 (1983);

*see also Wilke v. Robbins*, 551 U.S. 537, 553 (2007); *Carlson*[22], 446 U.S. at 18-23.  Second, the FTCA immunizes the federal government for liability for its agents' discretionary actions—i.e. actions that "involve an element of judgment or choice."  *See* 28 U.S.C. § 2680(a); *Chien v. U.S.*, 2019 WL 4602119 (D.D.C. Sept. 23, 2019) (dismissing claims under FTCA's discretionary function exemption).  Given the nature of Plaintiffs' claims—that Defendant Barr (and the Official-Capacity Defendants) did not act in accordance with any law or policy in choosing to forcibly clear Lafayette Square—an FTCA claim is not available.

Because Plaintiffs' claims do not present a new *Bivens* context and no special factors exist, Defendant Barr's Motion should be denied.

### 3. *Defendant Barr is not entitled to qualified immunity.*

In addition to his *Bivens* argument, Defendant Barr argues that he is entitled to qualified immunity because he (allegedly) was not personally involved in the attack on Plaintiffs.  (Def. Barr MTD at 27).  To determine if a government official is protected by qualified immunity, courts consider whether the facts alleged "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right . . .[and, if so,] whether the right was clearly established."  *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006) (internal quotations and citation omitted).  To be a "clearly established" right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right."  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  The "salient question" is "whether the state of the law" gave the actor "fair warning" that the conduct was unconstitutional.  *Hope v. Pelzer*, 536 U.S. 730, 731 (2002).  That existing precedent is not precisely on-point is immaterial;

---

[22]  Defendant Barr concedes that *Carlson* held in 1980 that the FTCA is not an alternative to *Bivens* claims.  (Def. Barr MTD at 25); *Carlson*, 446 U.S. at 23.  Nevertheless, Defendant Barr alleges that *Carlson* may not have survived *Abbasi*.  (Def. Barr MTD at 25-26).  Importantly, nothing in *Abbasi* can be read to overrule *Carlson*; the Supreme Court never suggested that the FTCA forecloses *Bivens* claims.

qualified immunity must be denied "in the obvious case where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal quotations and citation omitted). The rationale for not imposing a limitation on prior precedent is plain; "outrageous conduct obviously will be unconstitutional, this being the reason . . . that the easiest cases don't even arise." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377 (2009) (internal quotations and citation omitted); *see also Hope*, 536 U.S. at 741 (noting that "officials can still be on notice that their conduct violates established law . . . in novel factual circumstances").

Defendant Barr cannot raise the shield of qualified immunity; he was personally involved in ordering an unprovoked, unwarned, violent attack on Plaintiffs and other peaceful protesters in Lafayette Square that was flagrantly unconstitutional and violated Plaintiffs' First and Fourth Amendment rights. Each of Defendant Barr's constitutional violations is addressed in turn.

### a) Defendant Barr personally violated Plaintiffs' constitutional rights.

As a threshold matter, Defendant Barr's argument that he did not personally violate Plaintiffs' constitutional rights may be promptly dispelled. A government official personally participates in his subordinate's misconduct when he "know[s] about the conduct and facilitate[s], approve[s], or condone[s] it, or turn[s] a blind eye for fear of what he might see." *Elkins v. District of Columbia.*, 610 F. Supp. 2d 52, 64 (D.D.C. 2009). Applying this standard, this Court held in *Elkins* that a defendant who was not present during an unconstitutional search could still be held liable based on the fact that he was the "driving force" behind the issuance of the warrant, was "involved in conversations with the District's attorney regarding the search warrant." *Id.* at 66-67.

Like the Defendant in *Elkins*, Defendant Barr was the "driving force" behind the order to forcibly clear the peaceful protesters from Lafayette Square. He personally issued the order to forcefully expel peaceful protesters from Lafayette Square, as the Department of Justice has acknowledged, and he was physically present in Lafayette Square moments before and during the execution of that order by militarized law enforcement agents. (Compl. ¶¶ 4, 8, 29-30, 43). That he himself did not specifically remove Mr. Roth and Ms. Kavanagh from Lafayette Square is immaterial; as set forth in Plaintiffs' complaints, they were harmed because of an order he gave and conduct he authorized. (Compl. ¶¶ 4, 8, 29-30, 43). Contrary to his assertions, Defendant Barr was intimately involved in the violations of Plaintiffs' constitutional rights.

### b)  Defendant Barr violated Plaintiffs' clearly established First Amendment rights.

Defendant Barr's attack on Plaintiffs' peaceful protest of police brutality in Lafayette Square was a blatant violation of their First Amendment right to expression in a public forum. Again invoking amorphous national and presidential security concerns, Defendant Barr asserts that the violent clearing of Lafayette Square was a content-neutral, permissible restriction on the time, place, and manner of Plaintiffs' speech. (Def. Barr MTD at 30).

In a public forum[23] like Lafayette Square, any restriction on expressive activity must be reasonable and "narrowly tailored to serve a significant government interest . . . leav[ing] open ample alternative channels of communication." *United States v. Grace*, 461 U.S. 171, 177 (1983) (internal quotations and citation omitted). A narrowly tailored restriction is one that does "not burden substantially more speech than is necessary to further the government's legitimate

---

[23]   Lafayette Square is a "quintessential public forum." *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) (internal quotations and citation omitted).

interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (internal quotations and citation omitted). In addition, the regulations must be content- and viewpoint-neutral. *See id.* at 477.

Defendant Barr's actions do not meet this standard; his order was not narrowly tailored to serve any significant government interest, and it was not viewpoint-neutral.

### i. Defendant Barr's order to forcibly clear Plaintiffs from Lafayette Square was not narrowly tailored.

Defendant Barr's order to forcibly clear Lafayette Square of peaceful protesters (including Plaintiffs)—and Defendants' subsequent execution of that order—was not narrowly tailored. Without any warning, Plaintiffs were pummeled by tear gas, chemical grenades, pepper balls, rubber bullets, and rampaging law enforcement officers. (Compl. ¶ 33). Even accepting, for the sake of argument, the propriety of the proffered end goal of clearing Lafayette Square (to clear space for a photo op), Plaintiffs and the other peaceful protesters could have been clearly and audibly instructed to move—a tactic with which the Secret Service is familiar. *See Wood v. Moss*, 572 U.S. 744, 751-54 (2014) (Secret Service moved demonstrators away from where President Bush was unexpectedly dining). Though Defendant Barr need not have used the least restrictive means, *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989), the militarized blitzkrieg he chose to employ was, arguably, the **most** restrictive option. Short of opening fire on the protesters with rounds of ammunition, Defendants' clearing of Lafayette Square could not have been any more violent.

The attack Defendant Barr ordered on Plaintiffs burdened substantially more speech than was necessary to clear space for the Trump to walk to St. John's Church. *See Tatum v. Morton*, 402 F. Supp. 719, 742 (D.D.C. 1974) ("Whether it be a threat of violence from a crowd viewing the exercise of First Amendment rights or a possibility of violence from outsiders who may join such a demonstration, the police may not act in the derogation of First Amendment rights except

in circumstances where the public safety is so in need of protection that an interference with First Amendment rights is warranted.").  While Defendant Barr characterizes his response as merely "an on-the-spot crowd clearing order covering a one-block area" (Def. Barr MTD at 31), Plaintiffs' Complaints portray an entirely different account[24] that has been corroborated by footage of the demonstration.  (Compl. ¶ 49).  Defendant Barr's actions resulted in a complete denial of Plaintiffs' right to peacefully protest in Lafayette Square,[25] and left them with significant physical and psychological injuries.

Defendant Barr cites *White House Vigil for ERA Committee v. Clark*, 746 F.2d 1518 (D.C. Cir. 1984) in support of his argument that his order to clear Lafayette Square was narrowly tailored.  (Def. Barr MTD at 34).  However, *Clark* supports Plaintiffs' position, not Defendant's. In upholding a regulation regarding the size and placement of signs in Lafayette Square, the D.C. Circuit was careful to caution that **"a strong argument could have been made that a regulation banning all demonstrations on the White House and in Lafayette Park would have been unconstitutional."**  *Id.* at 1527 (emphasis added).  By clearing Lafayette Square of all protesters, and leaving them with no alternative channels of communication, Defendant Barr's actions amounted to an unconstitutional ban.

Defendant Barr's reliance on *Wood* is equally misplaced.  (Def. Barr MTD at 30).  Unlike in this case, the protesters in *Wood* were relocated to a nearby area so they could continue

---

[24]  "It is essential to remember that, for the purposes of ruling on a motion to dismiss, the factual allegations of the complaint **must** be presumed to be true and liberally construed in favor of the [p]laintiff." *Paulin*, 878 F. Supp. 2d at 245 (emphasis in original).

[25]  It further bears noting that Defendant Barr did not leave Plaintiffs with any alternative channels of communication.  Defendant Barr conclusively states that "virtually any other permissible location" was available for protest, but fails to identify even one location within Lafayette Square.  (Def. Barr MTD at 34).  As the D.C. Circuit has explained, alternative channels must exist "within the forum in question." *Initiative Referendum Inst. v U.S. Postal Serv.*, 417 F.3d 1299, 1310 (D.C. Cir. 2005).

demonstrating.  *Wood*, 572 U.S. at 754.  And the legal question at issue in *Wood* was different than the one raised here; *Wood* concerned the relative placement of two groups of demonstrators with opposing views, *see id.* at 759-61, not a complete dispersal of a peaceful protest advancing a single viewpoint.

Importantly, Defendant Barr "bears the burden of showing that [his] restriction of speech is justified."  *Doe*, 968 F.2d at 90.  If Defendant Barr wishes to assert the forceful clearing of Lafayette Square was narrowly tailored, he can do so at a later stage of this litigation.  *See id.* at 90-91 (evaluating tailoring reference in the context of a developed record, including evidence proffered by the government).  This Court is under no obligation to "defer to [an agency's] unexplained judgment."  *Id.* at 90.  Instead, Plaintiffs should be allowed to proceed with discovery, where Defendant Barr can introduce evidence to support his claim.

### ii.  *The creation of a photo opportunity is not a significant government interest.*

In his attempt to justify his order to violently clear Lafayette Square, Defendant Barr repeatedly cries "presidential security," which at least sounds like a significant government interest.  (Def. Barr MTD at 30).  Peer behind the curtain, however, and this is utter nonsense. There were no significant government interests at stake that justified the deployment of militarized law enforcement against peaceful protesters.  Defendant Barr has all but admitted that Lafayette Square was cleared merely to afford Trump a photo opportunity; on June 4, 2020, Defendant Barr stated, "The president . . . should be able to walk across the street to the church of presidents . . . I don't necessarily view that as a political act."  (Compl. ¶ 51).  This statement undermines Defendant Barr's assertion that the protesters were moved for the safety of Trump and only serves to indicate that Lafayette Square was cleared for the sole purpose of allowing

Trump to pose for photographs—a personal motivation that does not come anywhere close to the benchmark of a "significant government interest."

### iii. Defendant Barr's order to forcibly clear Plaintiffs from Lafayette Square was not viewpoint neutral.

Defendant Barr's order to forcibly clear Plaintiffs from Lafayette Square was anything but viewpoint neutral. "It is a bedrock principle of First Amendment law that in administering a public forum, the government may not permit speech that expresses one viewpoint while prohibiting speech that expresses the opposite viewpoint." *Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997) (internal quotations and citation omitted). Put differently, **"a government entity may not exclude from a public forum persons who wish to engage in First Amendment protected activity solely because the government actor fears, dislikes, or disagrees with the opinions of those citizens."** *Id.* at 1459 (emphasis added).

In *Mahoney*, the National Park Service revoked a permit for anti-abortion demonstrators at President Clinton's inauguration and threatened them with arrest, conceding that "if instead of carrying graphic posters of late term abortions or signs containing criticisms of the President, Mahoney were to carry signs offering congratulations or best wishes to the President, he would not be subject to arrest." *Id.* at 1454-1456. The D.C. Circuit struck down this restriction as "blatant discrimination between viewpoints." *Id.* at 1456. Plaintiffs allege the same type of discrimination present in *Mahoney*; it is clear that had they carried on a demonstration in line with Trump's viewpoints, they would not have been targeted. (*See* Compl. ¶¶ 58-65).

For obvious reasons, "the government rarely flatly admits it is engaging in viewpoint discrimination." *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 365 (D.C. Cir. 2018) (internal quotations and citations omitted). Instead, viewpoint discrimination is often proven by circumstantial evidence, such as retrospective evidence,

prospective evidence, and evidence of differential treatment.  *See id.* at 365-66; *see also Mahoney*, 105 F.3d at 1452.  It comes as no surprise that Defendant Barr denies he engaged in viewpoint discrimination because he "excluded all people from [Lafayette Square], regardless of what views they expressed."  (Def. Barr MTD at 32).  All evidence points to the contrary.  Plaintiffs and their fellow protesters were assembled in Lafayette Square on June 1, 2020, for the same cause—to protest against police brutality of black people.  (Compl. ¶¶ 6, 25).  Prior to June 1, Trump repeatedly threatened the protesters with force, evoking historical encouragements of police brutality against black people by promising "when the looting starts, the shooting starts."  (Compl. ¶ 21(a-f)).  In stark contrast, he invited his own supporters to gather at the White House, tweeting "Tonight, I understand, is MAGA NIGHT AT THE WHITE HOUSE???"  (Compl. ¶ 21(c)).

Trump's own words condemn any argument that the order to clear Lafayette Square was viewpoint neutral.  In issuing the order, Defendant Barr clearly—and personally—violated Plaintiffs' First Amendment rights.

### iv.     *Plaintiffs' First Amendment right to protest in Lafayette Square is clearly established.*

If this Court determines that Plaintiffs' First Amendment rights were violated, it must then decide whether those rights were clearly established.  *Barham*, 434 F.3d at 572.  The answer to that question is an easy "yes."  The D.C. Circuit has held that "the right to express[] one's views while standing on the public sidewalk in front of the White House . . . a public forum . . . has been clearly established . . . [since at least] 2009."  *Hartley*, 918 F. Supp. 2d at 57.  In reaching this holding, the D.C. Circuit "point[ed] to many decisions that have put police officers on notice for decades that protest[e]rs present on public property have a First Amendment right to peacefully express their views, in the absence of narrowly tailored ordinances restricting the time, place, or manner of the speech."  *Id.* (internal quotations and citation omitted).  Against the backdrop of

this precedent, it is unquestionable that Plaintiffs' First Amendment right to protest in Lafayette Square is clearly established.

### c) Defendant Barr violated Plaintiffs' clearly established Fourth Amendment rights.

At the direction of Defendant Barr, law enforcement officers seized Plaintiffs and used excessive force against them in violation of the Fourth Amendment.  (Compl. ¶¶ 67-68).  The Fourth Amendment "protects the right of the people to be secure in their persons . . . against unreasonable searches and seizures." *Ass'n of Indep. Sch. of Greater Washington v. District of Columbia.*, 311 F. Supp. 3d 262, 273 (D.D.C. 2018) (internal quotations and citation omitted). Because Plaintiffs were both seized—and the seizure amounted to an unreasonable exercise of excessive force—Plaintiffs' Fourth Amendment rights were violated.

### i.   Plaintiffs were seized when Defendants used military-grade weapons to clear them from Lafayette Square.

A seizure is effected when government officials, "by means of physical force or show of authority, terminate[] or restrain[] [a person's] freedom of movement, through means intentionally applied." *Bredlin v. California*, 551 U.S. 249, 254 (2007) (internal quotations and citation omitted).  "[T]he crucial test" for a Fourth Amendment seizure "is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (internal quotations and citation omitted).

Under attack from tear gas, chemical grenades, and rubber bullets, to say Plaintiffs were not "at liberty to ignore the police presence" would be an understatement.  (Compl. ¶ 33; Kavanagh Compl. ¶ 33).  Any reasonable person would have felt compelled to flee—as Plaintiffs desperately attempted to do.  (Compl. ¶¶ 33-37; Kavanagh Compl. ¶¶ 33-40).  It is undeniable in this case that Plaintiffs were seized.

### ii.     Defendants used excessive force against Plaintiffs.

"[U]se of force is excessive and therefore violates the Fourth Amendment if it is not 'reasonable,' that is, if 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' is weightier than the 'countervailing governmental interests at stake." *Rudder v. Williams*, 666 F.3d 790, 795 (D.C. Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  In the words of the D.C. Circuit, "[t]he cases add up to the sensible proposition that a police officer must have some justification for the quantum of force he uses." *Johnson*, 528 F.3d at 977.  Put simply, **"force without reason is unreasonable."** *Id*. (emphasis added).

Adhering to this plain, common-sense notion requires the denial of Defendant Barr's Motion.  Plaintiffs broke no laws and posed no threat; they were peacefully protesting in Lafayette Square.  (Compl. ¶¶ 32).  Without giving any audible warning to move, Defendants instead advanced on Plaintiffs and the other peaceful protesters with tear gas, chemical grenades, and rubber bullets.  (Compl. ¶ 33-34).  Defendants continued their attack even while Plaintiffs were clearly trying to flee; Ms. Kavangh specifically was struck with a riot shield, riot stick, and chemical grenade, all while trying to escape the unfolding chaos caused by Defendants' savage charge.  (Compl.  ¶¶ 35-37; Kavanagh Compl. ¶¶ 35-40).

Defendant Barr cannot point to a single act by Plaintiffs that would have justified the force inflicted upon them.  Instead, Defendant Barr points to the reports of "unrest" in previous days to justify the attack.  (Def. Barr MTD at 34-35).  This guilt-by-association argument does not pass constitutional muster; probable cause to seize an individual must be particularized to the person being seized.  *Barham*, 434 F.3d at 573-74.  In the search context, the Supreme Court has held that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

In *Barham*, after witnessing acts of violence by some demonstrators, then-Assistant Chief of Police Newsham ordered that hundreds of demonstrators (peaceful and otherwise) be arrested. *Barham*, 434 F.3d at 569-70.  The arrestees filed a class action, and the D.C. Circuit affirmed the district court's denial of qualified immunity, holding that the "mass . . . arrest violated the clearly established Fourth Amendment rights of plaintiffs by detaining them without particularized probable cause."  *Id.* at 573.  "Even assuming that Newsham had probable cause to belief that **some people** present that morning had committed arrestable offenses, he nonetheless lacked probable cause for detaining **everyone** who happened to be in the park."  *Id.* at 573-74 (emphasis in original).

Defendants' use of force against Plaintiff in Lafayette Square is even more attenuated than the use of force in *Barham*.  Nothing in Plaintiffs' Complaint (or Defendant Barr's Motion) connects Plaintiffs to any alleged "unrest" perpetrated by other protesters at different times elsewhere in the city.  If innocent and peaceful citizens could be subject to attack by sheer virtue of their shared ideology with actors engaged in illegal activity at some other time and place, the Fourth Amendment would disintegrate to nothing more than shreds of antique paper.

For the umpteenth time, Defendant Barr raises the talisman of presidential security to justify the force used on Plaintiffs.  (Def. Barr MTD at 35-36).  Again, this attempt must fail.  As discussed above (*see supra* Sec. III(B)(2)(a)) and held in *Hickel*, "mere mention of the President's safety" does not defeat a constitutional right.  *Hickel*, 421 F.2d at 1117.  Nor are these blanket justifications sufficient to overcome precedent regarding Defendants' specific uses of excessive force; the D.C. Circuit has held that baton strikes (like the one used on Ms. Kavanagh) against non-threatening and non-resisting individuals violates the Fourth Amendment.  *See Rudder*, 666 F.3d at 795 (baton strike "unprovoked and without warning" violates the Fourth Amendment).

The D.C. Circuit has further recognized that the unjustified use of chemical agents is unconstitutionally excessive, *Norris v. District of Columbia*, 737 F.2d 1148, 1152 (D.C. Cir. 1984), a finding that has been endorsed time and again in other circuits.  *See Nelson v. City of Davis*, 685 F.3d 867, 886 (9th Cir. 2012) ("[A] reasonable officer would have been on notice that both the firing of a projectile that risked causing serious harm, in the direction of non-threatening individuals who had committed at most minor misdemeanors, and the release of pepper spray in the area occupied by those individuals, would constitute unreasonable force in violation of the Fourth Amendment); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160-61 (10th Cir. 2008) (finding that it was clearly established that use of a pepper ball gun against a peaceful protester who did not hear law enforcement officer's order to disperse violated his Fourth Amendment rights); *Headwaters Forest Def. v. Cty. of Humboldt*, 276 f.3d 1125, 1130 (9th Cir. 2002) ("[I]t would be clear to a reasonable officer that it was excessive to use pepper spray against nonviolent protesters.").

Viewing the attack on Plaintiffs in light of this precedent, it is readily apparent that deployment of military-grade weapons and force to clear Plaintiffs from Lafayette Square was entirely excessive and unconstitutional.

### iii.   *Plaintiffs' Fourth Amendment rights are clearly established.*

If the Court determines that Plaintiffs' Fourth Amendment rights were violated, it is as easy to determine that those rights are clearly established as it is in the First Amendment context. When an officer's conduct is "such an obvious violation of the Fourth Amendment's general prohibition on unreasonable force . . . a reasonable officer would not have required prior case law on point to be on notice that his conduct was unlawful." *Jennings v. Jones*, 499 F.3d 2, 17 (1st Cir. 2007); *see also Wesby*, 138 S. Ct. at 589-90 (holding that qualified immunity must be denied "in the obvious case where the unlawfulness of the officer's conduct is sufficiently clear even

though existing precedent does not address similar circumstances" (internal quotations and citations omitted)).

One would be hard pressed to find a more obvious violation than the one before this Court. Any reasonable officer would have known that using tear gas, chemical grenades, rubber bullets, and riot gear against Plaintiffs without first giving them an adequate, audible warning to disperse would violate their Fourth Amendment rights. In the days following the attack, current and former government officials condemned the forceful clearing of Plaintiffs and other peaceful protesters from Lafayette Square, stating unequivocally that it violated their First and Fourth Amendment rights. (Compl. ¶¶ 54-57).

Because the attack on Plaintiffs in Lafayette violated their clearly established Fourth Amendment rights, Defendant Barr is not entitled to qualified immunity and his Motion must be denied.

## IV.   Conclusion

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the motions of the Official-Capacity Defendants and Defendant Barr.

Dated: March 1, 2021                                  Respectfully submitted,

                                                    REGAN ZAMBRI LONG PLLC

                                     By:   */s/ Patrick M. Regan*
                                           Patrick M. Regan          #336107
                                           pregan@reganfirm.com
                                           Christopher J. Regan        #1018148
                                           cregan@reganfirm.com
                                           Emily C. Lagan   #1645159
                                           elagan@reganfirm.com
                                           1919 M Street, NW, Suite 350
                                           Washington, DC 20036
                                           PH: (202) 463-3030
                                           FX: (202) 463-0667
                                           *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing Plaintiffs' Omnibus Memorandum of Points and Authorities in Opposition to Defendants' Motions to Dismiss and proposed Order were electronically filed and served on all parties.

 */s/ Patrick M. Regan*
Patrick M. Regan